[No. C020235. Third Dist. June 5, 1996.]

CLIFFORD KOSTER et al., Plaintiffs and Appellants, v.
COUNTY OF SAN JOAQUIN et al., Defendants and Respondents;
COSE & ASSOCIATES et al., Real Parties in Interest and Respondents.

## COUNSEL

Mark V. Connolly for Plaintiffs and Appellants.

No appearance for Defendants and Respondents.

Neumiller & Beardslee, Steven A. Herum, Thomas H. Terpstra, Jose L. Alva, McDonough, Holland & Allen and Richard E. Brandt for Real Parties in Interest and Respondents.

## OPINION

**MORRISON, J.**—This is a CEQA case (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.; further undesignated section references are to this code). One recurring observation in CEQA cases is that agencies must confront environmental realities in public, because CEQA generally forces agencies to provide *reasons* for their actions. Where, as here, an environmental impact report (EIR) makes recommendations which the agency chooses to reject, the agency must explain its reasons and such reasons are subject to challenge in a court of law.

The Board of Supervisors for the County of San Joaquin (the Board) considered several options to accommodate population growth. The Board considered but rejected a proposal to limit growth to existing cities and included one new town and one newly "expanded community" (real parties in interest New Jerusalem and Riverbrook, or new towns, collectively New Jerusalem except where otherwise apparent) in a long-range general plan amendment (General Plan 2010). Appellants (collectively, Koster) filed a petition for a writ of mandate, seeking to overturn the Board's findings which permitted the inclusion of these new towns in General Plan 2010. The trial court rejected the challenge as premature, reasoning that Koster could challenge the environmental impacts of each town when concrete plans were submitted by the developers. We disagree with the trial court.

Although the particulars of the new towns must be challenged, if at all, when specific plans are submitted, the lawfulness of the decision by the

Board to favor "new community" growth over "city-centered" growth, represented by a statement of overriding considerations, is a present issue in controversy between the parties and must be decided at this juncture. The trial court did not purport to decide the merits of the petition, which must be determined on the basis of a 41,000-page administrative record which the parties have not provided to us. We shall reverse and remand with directions to the trial court to consider Koster's petition on the merits.[1]

## BACKGROUND

Koster filed his petition on August 28, 1992, seeking to overturn the Board's decisions of July 29, 1992, specifically, resolution Nos. B-92-1357 (overriding considerations); R-92-691 (General Plan 2010); B-92-1354 (Riverbrook); B-92-1352 (New Jerusalem); and two ordinances. Broadly speaking, the petition alleged no substantial evidence supported certain findings by which the Board placed the two towns in the General Plan 2010. The petition expressly disclaimed any challenge to the EIR certified by the Board by Order No. B-92-1355.

Koster filed an amended petition on March 11, 1994. It emphasized that Koster was attacking the Board determinations only as to New Jerusalem and Riverbrook. The Board and Koster filed a stipulation reflecting the narrowed scope of the challenge. Apparently the purpose was to cut the Board out of the suit and relegate the defense to the developers. We will revisit the scope of the stipulation in part II-A, *post*.

The EIR identified "no project" as the best option, based on the lack of need of the new towns, and rated "city centered growth" the second best option. The Board rejected these options in favor of the two new towns, which would result in the loss of some three thousand five hundred acres of prime farm land. Generally speaking, such rejection is permitted if and only if the Board's "statement of overriding considerations" is supported by substantial evidence in the administrative record and provides the Board's rationale for rejecting the recommendations of the EIR, or if the Board finds the project will not have any significant effect on the environment. (§§ 21002, 21002.1, 21081, subd. (b); Cal. Code Regs., tit. 14 (hereafter Guidelines), §§ 15021, 15043, 15091, 15093; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12] [". . . the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision . . . . [T]he Legislature sought to direct the

---

[1]The request for judicial notice of subsequent Board action regarding Riverbrook, now apparently the subject of another lawsuit, is denied.

reviewing court's attention to the analytic route the administrative agency traveled from evidence to action. In so doing, we believe that the Legislature must have contemplated that the agency would reveal this route."]; *Sierra Club* v. *Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222-1224 [13 Cal.Rptr.2d 182]; *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1035 [185 Cal.Rptr. 41] ["when a project is approved that will significantly affect the environment, CEQA places the burden on the approving agency to affirmatively show that it has considered the identified means of lessening or avoiding the project's significant effects and the explain its decision allowing those adverse changes to occur"]; Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (8th ed. 1994) The EIR Process, pp. 167-169.)

Without reciting the entire amended petition and accompanying points and authorities, both in the trial court and on appeal Koster attacks the statement of overriding consideration related to the two towns, raising separate but interrelated challenges about the feasibility of alternatives, mitigation measures, the extent of certain impacts and the sufficiency of the evidence to support the finding of overriding considerations. (We do not say any of the challenges are *meritorious*, only that Koster made them.)

The trial court denied the petition in a thorough written order which sets out with clarity the nature of the case:

"This Writ of Mandate attacks three resolutions adopted by the Board of Supervisors; Resolution Approving General Plan Amendment No. GP-92-6, General Plan 2010, Resolution B-[92-1354], Areas of Proposed Expanded Community of Riverbrook, and Resolution B-92-1352, New Community of New Jerusalem.

"The Petition alleges the above referenced Resolutions do not comply with the California Environmental Quality Act (CEQA)[.] It is a broad based attack, alleging the Board's failure to comply with virtually every CEQA requirement and guideline. It is not, however, an attack on the sufficiency of the Environmental Impact Report [EIR].

SUMMARY OF FACTS

"In 1987, San Joaquin County initiated the process of amending the General Plan to accommodate growth in the county through the year 2010. At the inception, the amendment focused on the expansion of existing cities to accommodate the planned growth, In 1990, the approach to accommodate growth through 2010 took a dramatic change by focusing on the creation of new cities in addition to expanding the existing cities.

"In the summer of 1990, the Board referred back to the Planning Commission nine potential projects for possible inclusion in the 2010 General Plan. . . . These projects were a mix of new communities and expanded communities. After a few years of meetings, hearings and listening to both sides of the issues, the Board . . . approved New Jerusalem and the expanded community of Riverbrook.

"After the approval of the General Plan, Petitioners brought this [petition]. Several months later the petition was amended and a stipulation was filed. The stipulation basically withdraws objection to the General Plan, the subject of Resolution GP 92-6. The only objection they have relates to Resolution B-92-1354, Riverbrook and Resolution B-22-1352, New Jerusalem.

"The Respondents contend the three resolutions meet all the requirements of CEQA. [¶] They contend the Petitioners misconstrue the inclusion of New Jerusalem and Riverbrook in the General Plan and the Plan does not authorize the construction of anything until a further EIR is prepared to meet the Petitioner's concerns.

"[A review of general CEQA principles is omitted.]

"The Court finds the thrust of the Petition attacks the sufficiency of the General Plan's EIR as it relates to the two approved cities. The Petitioners simply miss the point. This General Plan does not 'approve' the construction of these two cities. It is merely a possibility if the contemplated EIR's for those projects satisfy CEQA.

"There are several requirements in the General Plan's growth accommodation strategy and the location of urban density strategy. Before either of the cities are authorized and approved, the development must meet four general requirements:

"1.  Adequate public services exist or are provided for the development.

"2.  The funds necessary for all on-site and off-site improvement triggered by the proposed development are provided or contributed.

"3.  *The environmental impacts of the development are reduced to acceptable levels.*

"4.  The development does not adversely affect the fiscal health of the county.

"In addition to these four general conditions, the administrative record contains several specific requirements that must be met before any construction begins.

"The Petitioners contend that these requirements are merely promises to do additional studies in the future, usually at the specific plan stage and somehow this violates CEQA.

"The Court agrees the General Plan anticipates specific site EIR's, but disagrees that it violates CEQA.

"The Petitioner[s] ignore the difference between a 'program' EIR and a 'site specific' EIR. The EIR for the General Plan is a program EIR and contemplates site specific EIR as authorized by [CEQA]. This is often referred to as tiering and tiering is appropriate when the sequence of EIR[s] is: '(a) from a General Plan, policy or program EIR to a . . . site specific EIR.' Guideline 15385.

"This tiering concept has been approved by several cases and in fact was adopted in the *Sher Bill* signed into law last year."

The court then discussed certain authorities, which we address *post*, and concluded "the writs are premature, as the Board's approval of the General Plan does not equate to the project approvals that require additional EIR's before there is a 'project approved'."

DISCUSSION

I

*Tiering*

We agree with the trial court's premise that the EIR in question reflects "tiering," but disagree with the trial court's conclusion therefrom. In our view the concept of "tiering," if it does anything, aids Koster. Koster does not want any "additional EIR's" as the trial court assumed—he wants to test the legality of the Board's decision to reject the recommendations in the existing EIR.

The "Sher Bill" is a reference to chapter 4.5 of division 13 of the code, "Streamlined Environmental Review," (Stats. 1993, ch. 1130) which in part promotes the employment of "master" EIR's and "focused" EIR's, which is in reality a complex form of "tiering." (Compare § 21156 et seq. with

§ 21093; see Remy et al., Guide to the Cal. Environmental Quality Act (CEQA), *supra*, Means of Avoiding Redundancy in Preparing EIRs, at pp. 232-245; Bass & Herson, Successful CEQA Compliance: A Step-by-Step Approach (3d ed. 1994) Preparation and Review of an EIR, pp. 43-52, and especially p. 50 ["The provisions added in 1993 do, however, have several shortcomings. . . . A tiered EIR or Program EIR can achieve many of the Master EIR's streamlining benefits more simply."].) The cases to which the trial court adverted discuss ordinary "tiering," a method by which the scope and intensity of an EIR can be adjusted, depending on the focus of the "project."

"Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental consider-ations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Guidelines, § 15004, subd. (b).)

■ "[T]iering is a process by which agencies can adopt programs, plans, policies, or ordinances with EIRs focusing on 'the big picture,' and can then use streamlined CEQA review for individual projects that are consistent with such . . . and . . . are consistent with local agencies' governing general plans and zoning." (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA), *supra*, p. 234, col. b.)

" 'Tiering' refers to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discus-sions and concentrating solely on the issues specific to the EIR subsequently prepared. Tiering is appropriate when the sequence of EIRs is: [¶] (a) From a general plan, policy, or program EIR to a program, plan, or policy EIR of lesser scope or to a site-specific EIR." (Guidelines, § 15385; see §§ 21068.5, 21093 [express policy is to avoid "repetitive discussions of the same issues in successive" EIR's and ensure later EIR's "are consistent with a previously approved policy" so as to "concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project"]; Guidelines, § 15152 [same]; *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318-1319 [8 Cal.Rptr.2d 473].)

In practice the first "tier" may consist of a general plan or program EIR, which discusses agency-wide programs, policies and cumulative impacts. The second tier may consist of a specific plan EIR, which discusses a particular region within the agency. The third tier may consist of an ordinary

development project EIR, which discusses a particular site. (See Bass & Herson, Successful CEQA Compliance: A Step-by-Step Approach, *supra*, p. 52, figure 3-5.) "A first-tier EIR may defer for future study specific impacts of individual projects that will be evaluated in subsequent second-tier EIRs. Additionally, a first-tier EIR may contain generalized mitigation criteria and policy-level alternatives." (*Ibid.*) ▆▆ The EIR for General Plan 2010 is, as the trial court concluded, such a first-tier EIR, which amounts to a long-term and wide-focus study about the county and its environmental future.

In some cases, "tiering" has been used to defend claims that an EIR was required: The defense urges that specific impacts of a portion of a large "project" need not be considered until the relevant portion of the overall project is proposed. For example, in *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729 [22 Cal.Rptr.2d 618], the Port of Long Beach adopted a master plan amendment which set forth "six anticipated port projects." (18 Cal.App.4th at pp. 726-737, 742.) "The locations of the 'anticipated' projects were provided so that the five-year plan [PMP 90] could be discussed in a reasonably detailed manner. In this view, PMP 90 merely indicated the *preferred* locations for the six 'anticipated projects.'" (P. 742.) At about the same time, the port approved project EIR's for two of the projects, and "each considered alternatives to the specific projects, including alternative locations, without claiming any weight for any supposed 'planning' of locations by PMP 90. In an analogous case, the court held that an EIR was not required to be prepared when a school district located a 'preferred' site for a school. Instead, consideration of alternative locations could be deferred to the time of the project EIR." (Pp. 742-743.) Because "there was no 'approval' of specific sites for the six 'anticipated' projects and that locations were discussed for the purposes of giving a reasonably detailed consideration to the overall five-year plan" (*id.* at p. 743, fn. omitted), the port properly limited the main EIR "to a consideration of alternatives to the overall five-year plan, which included the six 'anticipated projects,' while reserving without limitation the approval of each 'anticipated' project and its location to the [next-level] EIR." (P. 744.)

In language obliquely supporting Koster's position herein, *Al Larson* stated:

"The concept of tiering supports allowing the agency and the public to first decide whether it is a good idea to increase Port capacity in a given five-year period at all, or by means of the six 'anticipated projects.' If that decision is made in the affirmative then each individual project can be reviewed in-depth on its merits in a project EIR with no weight claimed for

any supposed 'approval' of the individual project or 'planning' of its location. On the other hand, if the agency rejects the overall goal then further consideration of the six 'anticipated' projects can be dropped." (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners, supra*, 18 Cal.App.4th at p. 744.)

The Legislature has found that "tiering is appropriate when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports." (§ 21093, subd. (a).) A corollary to this rule is that if a challenge is made to the "first" step in decisionmaking—whether to expand at all—such challenge must be made before the next step, or tier. If the challenge to the first step is sustained, the next step is obviated. That is the posture of this case: The Board rejected recommendations contained in the first tier EIR and Koster wants to test the legality of that first step—*now*.

The "school district" case referred to in *Al Larson,* is our opinion, *Stand Tall on Principles* v. *Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772 [1 Cal.Rptr.2d 107] (*STOP*), which was relied on heavily by the trial court in this case. But in *STOP,* all parties conceded a school district needed to build a new high school. We held that the district could first select a particular parcel, then prepare an EIR for that parcel. In *STOP* we distinguished *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779 [187 Cal.Rptr. 398, 654 P.2d 168], where:

"[T]he State Board of Education approved a plan to carve a new high school district out of an old one. This plan was to be submitted to the voters. The *Fullerton* court concluded the State Board should have undertaken an initial threshold study under CEQA to determine whether an EIR was required before approving the plan and submitting it to the voters. . . . This was because approval of the plan necessitated the building of a new high school and other actions potentially affecting the environment. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"The court in *Fullerton* acknowledged that specific plans had not yet been formulated for construction of the new high school and that 'delay of an environmental study until after the election might result in a more specific and useful study.' . . . The problem with such a delay, said the court, was that as a practical matter it precluded the alternative of continuing the status quo. Once the plan was approved, the new district would be created and the new high school would be built. . . . The situation presented here is not analogous. Under our decision, all reasonable alternatives must be thoroughly assessed. Thus, no alternative is precluded. Moreover, even STOP

concedes that a new high school is needed. In this context, as we have seen, preparing an EIR after the preferred site has been chosen may 'result in a more specific and useful study.' " (*STOP, supra,* 235 Cal.App.3d at p. 785, citations omitted.)

The trial court erroneously viewed *STOP* as controlling when it is, in fact, distinguishable. In *STOP* the school district had not prepared an EIR and rejected conclusions therein, as occurred here; moreover, there, the parties conceded a new school would be built, the question was *where.* In this case, the object of the action is to preclude the construction of new towns.

In *Fullerton,* a threshold study was required before a plan to split a district was to be voted upon: "The State Board . . . cannot argue that its approval of the secession Plan is not a project merely because further decisions must be made before schools are actually constructed, bus routes changed, and pupils reassigned." (32 Cal.3d at p. 795; see *id.,* p. 798, fn. 18.) "[A]s a practical matter State Board Approval of the secession Plan is an essential step leading to ultimate environmental impact; it is therefore . . . a 'project' within the scope of CEQA. . . ." (*Id.* at p. 797, citation omitted.) So, here, the *first step* of analysis is whether there will be any new towns. The EIR said no, the Board said yes, and Koster wants a court to determine the legality of the Board's answer.

We recognize that in *STOP* and *Fullerton* the issue was when to prepare an EIR or conduct a threshold study, while here everyone concedes an EIR was necessary at the general plan amendment stage (*Guidelines,* § 15378, subd. (a)(1); *Al Larson Boat Shop, Inc.,* v. *Board of Harbor Commissioners, supra,* 18 Cal.App.4th at p. 741), and an EIR was, in fact, prepared. But when the Board chose to reject the EIR's recommendations regarding "no new towns," the time was ripe to lodge objections to that choice. New Jerusalem states that "the mere designation of the new communities for development was not, by itself, an environmental impact"; "the Board's actions on the 2010 Plan had not approved or been requested to approve any activity with respect to New Jerusalem or Riverbrook that would cause a physical impact on the environment." It appears this argument depends on New Jerusalem's claims regarding the stipulation, discussed *post.* In particular, New Jerusalem *admits* Koster had only 30 days to challenge "the resolution making findings that certain proposed mitigation measures were infeasible," but urges "In this case, almost all of the findings for the 2010 Plan that Appellants allege lack the support of substantial evidence were not specific to New Jerusalem or Riverbrook. The Appellants were barred from objecting to them in this lawsuit by their stipulation and Amended Petition, not by the trial court." This telling passage expressly hinges New Jerusalem's case on the stipulation, discussed *post.*

Otherwise the argument regarding lack of "approval" lacks merit. The trial court's order states "The Board found 'the mere designation of the new communities for development was not, by itself, an environmental impact.' " That may be true, but that is not the question. New Jerusalem touts "tiering" as a legitimate method of deferring environmental review, but this is a red herring: The Board was asked to determine the fate of growth in the county, and selected new towns over "city-centered" growth. *The Board has already prepared and reviewed an EIR*: The Board recognized that this policy choice was a "project" under CEQA, i.e., it "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" (§ 21065; see § 21151; Guidelines, § 15378, subd. (a)(1) ["adoption and amendment of local General Plans or elements thereof"]): The EIR before the Board treated this selection as a "project" and addressed the potential environmental impacts thereof, the Board rejected the recommendations of the EIR, and found overriding considerations which supported that choice to reject the EIR. (Cf. *Kaufman & Broad-South Bay, Inc.* v. *Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 474, 476 [11 Cal.Rptr.2d 792] [formation of assessment district is not a "project" because it neither impels growth nor creates a need for construction of new school]; *Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 624-626 [263 Cal.Rptr. 813] [Negative declaration for plan amendment; future development contingent on compliance with traffic policy, plan had no present traffic consequences because "a specific development will require future environmental review," and "The decision leads City not one step closer to an ecological point of no return."].)

There is nothing in the record which suggests the Board did not treat this "element" (Guidelines, § 15378, subd. (a)(1)) of the general plan amendment as other than a project, only that it stated the designation of the new towns, "was not, by itself, an environment impact," and that further EIR's would precede construction, not that such designation could not foreseeably, albeit indirectly, cause a change in the environment: New Jerusalem acknowledges that Koster's challenge "is an argument against the Growth Accommodation Strategy and the Location of Urban Development Strategy," but, as discussed, *post*, unpersuasively argues Koster has abandoned such argument. When growth comes to the County of San Joaquin, the Board's plan is to shunt a significant part of it away from existing cities and that undoubtedly will change the environment. (See *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra*, 32 Cal.3d at p. 797 ["an essential step leading to ultimate environmental impact"]; cf. *Kaufman & Broad-South Bay, Inc.* v. *Morgan Hill Unified School Dist., supra*, 9 Cal.App.4th at pp. 474, 476.) That itself is a "definite course of action." (Cf. *Lee* v. *City of Lompoc* (1993) 14 Cal.App.4th 1515, 1523 [18 Cal.Rptr.2d 389].)

New Jerusalem acknowledges that "The public agency approvals subject to environmental review span a wide spectrum of underlying activities, ranging from construction projects . . . to general policy decisions that only indirectly impact the environment[.] A General Plan establishes general policies and implementing controls for all subsequent and subsidiary land use approvals by the County." New Jerusalem continues: "The CEQA Guidelines recognize, as did the trial court, that the impacts of policy decisions, such as the impacts of the adoption of a general plan, cannot be predicted or examined with the same exactitude and detail required for construction projects[.]" This is true, but that is an argument going to the merits of Koster's challenge to the policy choice, not the timing of his challenge. (See *Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 374 [7 Cal.Rptr.2d 307] [EIR for general plan "need not be as precise" as specific project EIR; the "difficulty of assessing future impacts of adopting a general level plan does not excuse preparation of an EIR, but merely reduces the level of specificity demanded"].)

We do not imply the Board's findings were adequate, only that the Board made some findings, acknowledging its duty to follow the EIR except where findings exist to justify departing therefrom. In this case, similar to *Fullerton Joint Union High School Dist.* v. *State Bd. of Education, supra,* 32 Cal.3d 779, the basis of Koster's petition is that the plan for future growth should follow the EIR and should not encompass new towns, not that the new towns selected by the Board are too big, lack sufficient parks, sewers or waste treatment facilities, are too dense, et cetera. It is true, under the reasoning of *STOP,* that when New Jerusalem and Riverbrook get around to submitting "site-specific" plans, the second or third tier EIR's therefor shall have to consider these points and all reasonable alternatives, including, in theory, "no project." Contrary to implications in the briefs, Koster does *not* assume the Board "committed itself to the full and final implementation of the Riverbrook and New Jerusalem projects." But the Board did reject the EIR, so when will Koster be able to challenge the adequacy of the statement of overriding considerations which contemplates approval of new towns? Why should that fundamental issue be deferred? The subsequent EIR's presumably will be limited in focus to the respective town. It makes more sense first to determine the legal outcome of what Riverbrook correctly terms the "fundamental policy debate over where future growth ought to occur within San Joaquin County." Both towns make much of the fact that extensive materials on each proposal were required to be submitted and the advantages and disadvantages of the proposals were weighed. Such weighing is subject to review. If the Board did act lawfully, the particulars of the new towns must satisfy more focused, detailed EIR's, and it appears all parties agree *that* should be a question for another day. But if the Board acted unlawfully,

it is vital for the sake of San Joaquin County that *that* be determined now, so the Board can repair the General Plan as soon as possible: If the Board acted unlawfully (a point we do not decide), the county needs to know *now* so that it can endeavor to provide wise growth management in the near future.

In *STOP* we pointed out that the EIR ultimately prepared when the proposed high school site was acquired would have to consider all reasonable alternative sites. (235 Cal.App.3d at p. 786; see *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners, supra,* 18 Cal.App.4th 742-743 [project EIR's "considered alternatives to the specific projects, including alternative locations, without claiming any weight for any supposed 'planning' of locations" by long-term plan].) The Board here has located the new towns on the map, in contrast to *Al Larson,* where the agency "chose not to 'approve' specific sites in the [long-range EIR], but to reserve that decision, and compliance with CEQA thereon, to the project EIR's." (See *id.* at p. 744.) As a practical matter we question how seriously any subsequent study would consider alternative sites for the new towns. New Jerusalem baldly states General Plan 2010 merely approved "general locations of development." Not so. In particular, a necessary condition of Riverbrook was its location—its sewage treatment and water were to be provided by the adjacent City of Riverbank, located in Stanislaus County. An "alternative location" analysis would be meaningless for Riverbrook. Similarly, a necessary condition of New Jerusalem was its location: "on a major, under-utilized, north-south highway, a railroad line, and an east west highway scheduled to be improved to a freeway. These locational advantages avoided the addition of unnecessary traffic to the critically overburdened sections of Highway 205 through Tracy to the Altamont Pass[.]" Indeed, New Jerusalem points to a supervisor's comment, that it "is uniquely situated in that it is adjacent to two state highways and Interstate 5." In these circumstances the Board's act of placing these towns on the map for possible future development is, to an extent not present in *STOP* and *Al Larson,* a true site *selection.* The Board did not merely find that two new towns of a certain approximate size should be considered somewhere in the southern part of San Joaquin County, subject to future environmental review of particular locations.

We agree that tiering is a good policy. To the extent a choice at any tier requires a finding by the Board, such finding must be lawful. Interested parties have a right to test the legality of the actions of the Board. In this case the Board made a choice and Koster believes it was unlawful. Now is the time to determine that question. Indeed, it is to the Board's advantage, and the public's to find out, *now,* whether the Board's broadest policy "step" is lawful.

## II

### *The Scope of the Challenge*

#### A. *The Stipulation*

New Jerusalem misinterprets the effect of the stipulation between Koster and the Board. New Jerusalem reasons as follows: The stipulation withdrew the challenge to General Plan 2010, except as to New Jerusalem. Koster may challenge New Jerusalem (at the appropriate time, of course). But any arguments against New Jerusalem which would not merely invalidate New Jerusalem but would invalidate other portions of General Plan 2010 must be deemed withdrawn. Because Koster's "policy" challenges would invalidate portions of General Plan 2010, and because challenges to the specifics of New Jerusalem are premature, Koster stipulated himself out of court.

We disagree with this reasoning. The stipulation provides as follows: ". . . Petitioners will limit their challenge to the General Plan to the two new towns projects approved by the Respondents, and the Petitioners do not intend, and will not request the entire General Plan be invalidated. In order to further clarify their position, Petitioners interpret their Petitioner [*sic*] for Writ of Mandate as follows": Then many paragraphs of the petition are deemed not to be at issue, or altered to state that certain points are narrowed. For example, that the resolution approving General Plan 2010 is not challenged "except to argue that the new towns of New Jerusalem and Riverbrook should not be included in said General Plan Amendment." Then the stipulation reflects that Koster will argue, inter alia, "the inadequacy of the Statement of Overriding Considerations, . . . but only as to the approval of the two new towns," "that Respondents have not stated any specific reasons that can be found in the record or the EIR that support their action in adoption and approval of the two new towns," and "that the Respondents failed to carry out their duty to adopt an alternative which did not include the new towns."

Finally "Petitioners and Respondent enter into this stipulation with the understanding that it is their intent to narrow the focus of the litigation from the General Plan as a whole, to the General Plan only to the extent it included the two new towns. *It is not the intent of this stipulation to in any way limit arguments or evidence which may be used by Petitioners in opposing the two new towns.*" (Italics added.)

In light of the above, it ill behooves New Jerusalem, not a party to the stipulation, to argue that somehow the stipulation insulates it from Koster's

petition. Koster did not stipulate himself out of court, nor does New Jerusalem offer any rational explanation why Koster, or the Board, would do so. If a particular attack on the statement of overriding considerations is successful and has the effect of invalidating part of General Plan 2010, so be it. Such a result would, under CEQA, be in the best interest of the public and the Board, which would then be in a position to bring the General Plan into compliance with the law. (Since the parties have not provided us with the administrative record we cannot tell what the effect of a successful challenge will be. We repeat that we imply no view on the merits of Koster's challenge.)

## B. *Indispensable Parties*

In a somewhat related claim, New Jerusalem (alone) argues that the fact the Board later approved a different new town, Mountain House, affects this case. The case relied on by New Jerusalem held a developer was an indispensable party in a zoning dispute. (*Beresford Neighborhood Assn.* v. *City of San Mateo* (1989) 207 Cal.App.3d 1180, 1187-1189 [255 Cal.Rptr. 434]; see Code Civ. Proc., § 389.) Riverbrook views the Mountain House issue as irrelevant. We agree with Riverbrook. Koster's challenge stands or falls on the legality of the Board's actions. It is not clear how the "approval" of Mountain House would preclude the court from granting relief in the instant case. Given that Koster's stipulation limited the challenge to New Jerusalem and Riverbrook, it is quite possible such challenge, if successful, will not affect Mountain House at all. We observe that Mountain House has not attempted to join this action, either in the trial court or on appeal as an amicus curiae. Perhaps it does not feel as threatened by the action as does New Jerusalem. Most importantly, the trial court did not address this point, although it was tendered in the New Jerusalem's answer and in the points and authorities, but decided the petition was premature. In these circumstances we decline to affirm the judgment for the purported failure to join Mountain House. Our conclusion is without prejudice to a properly presented motion by New Jerusalem in the trial court, so that court may exercise appropriate discretion. (See 1 Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1995) ¶ 2:160 et seq.)

## III

### The Challenge on the Merits

New Jerusalem argues substantial evidence supports the Board's actions. It is appropriate for the trial court to consider the evidentiary issues in the first instance. Although we often exercise de novo review in CEQA cases, in

many such cases, trial courts provide us with a thorough written opinion which helps to clarify issues for appeal. Although it is possible a new appeal may follow the hearing on remand, and such appeal may encompass some of the factual points briefed in this appeal, it is also likely such appeal will be narrowed, relieving the burden on this court.

■ The failure to provide us with the 41,000-page administrative record is chargeable to appellant, Koster. In many cases, where an incomplete record is provided, we hold that evidentiary issues are waived on appeal. (*Maguire* v. *Lees* (1946) 74 Cal.App.2d 697, 709 [169 P.2d 411] (opn. of Adams, P. J.) [failure to provide exhibits].) But, since the trial court did not pass on the evidentiary issues, we decline to reject Koster's challenges on this procedural point, or the alternative ground that he has failed to support his evidentiary claims on appeal by appropriate references to the record. (Cf. *Brovelli* v. *Bianchi* (1902) 136 Cal. 612, 613 [69 P. 416]; *Estate of Palmer* (1956) 145 Cal.App.2d 428, 431 [302 P.2d 629].) The gist of the appeal is to require the trial court to review the evidence and Koster's position on this point is correct. The proper course is to have the trial court plow the field: We shall glean from it what we may in the proper season.

## DISPOSITION

The judgment is reversed with directions to the trial court to consider Koster's challenges on the merits, in accordance with this opinion. Costs to Koster.

Sims, Acting P. J., and Scotland, J., concurred.