Opinion
 

 MORRISON, J.
 

 The trial court sustained a California Environmental Quality Act (CEQA) challenge. (Pub. Resources Code, § 21000 et seq.; further section references are to this code). The dispute in this case is about where to begin. Real parties in interest focus on defenses of statute of limitations and exhaustion of remedies. Plaintiffs defend the trial court’s focus on “tiering” and conclude the challenge lodged in this case was proper because there had been no prior opportunity to challenge this “tier” of the project. We shall modify the judgment and affirm.
 

 Procedural Background
 

 The Endangered Habitats League, Inc., and Union for a River Greenbelt Environment (Habitat) filed a petition for writ of mandate and declaratory relief on February 10, 1995, naming the State Water Resources Control Board (Water Resources) and Department of Fish and Game (Fish and Game) as respondents, and the Riverside County Flood Control and Water Conservation District and Riverside County as real parties. Real parties in interest share the same boards (Stats. 1971, ch. 273, § 1, p. 573), and will be referred to as Riverside. Riverside’s suggestion in a footnote that the county should not be a party is waived. (See
 
 Landa
 
 v.
 
 Steinberg
 
 (1932) 126 Cal.App. 324, 325 [14 P.2d 532].)
 

 On August 30, 1995, a stipulated judgment in favor of Water Resources and Fish and Game was filed. On January 9, 1996, the court entered a judgment denying injunctive relief and issuing a writ of mandate. Riverside appealed and Habitat cross-appealed.
 

 
 *231
 
 Factual Background
 

 On May 7, 1986, Riverside filed a negative declaration for its “Master Drainage Plan for the Murrieta Area” (Master Plan), which was prepared by Riverside’s general manager and chief engineér, Kenneth Edwards. This case involves two small channels within the larger project, known as Lines F and F-l, which are located within the City of Murrieta (City). The first paragraph of the Master Plan, under “purpose” states: “This master drainage plan is an engineering study, the purpose of which is to investigate and evaluate the drainage needs within the Murrieta Creek area, and to propose an economical drainage plan which provides flood protection for both existing and future development.” Further into the “purpose” appears the following: “The master plan document serves as a guide for the long-term construction scheduling of primary drainage facilities. It will also assist developers and others in the area in planning the sizes and locations of drainage facilities that are essential to individual projects. [¶] It should be noted that this study is a master plan; a study of the drainage problems that exist in a specific geographical area, and a conceptual solution to those problems. The selection of facilities presented in this plan is based upon engineering and economic considerations and is but one solution of many possible approaches to alleviating the drainage problems of the Murrieta Creek area. [¶] The alignment and location of the facilities proposed by the master drainage plan are general; precise facility locations will be dictated by conditions and other factors existing at the time of design. Similarly, the sizing information shown on the enclosed map is preliminary. A more detailed analysis performed at the design stage will determine final sizing.”
 

 The drainage area is over 220 square miles near the intersection of Interstate 15, Highway 215 and Highway 79. “The extent of the studies establishing this master plan includes: [¶] 1. Determination of the quantity and points of concentration of storm runoff in the area. [¶] 2. Preparation of a drainage area map. [¶] 3. Determination of the location, size and capacity of the proposed drainage structures. [¶] 4. Investigation of alternate routes and methods as a basis for selecting the most economically and engineeringly sound plan. [¶] 5. Preparation of preliminary design plans and supporting cost estimates.” There is not one word about environmental alternatives in the entire plan.
 

 The Master Plan “consists of the channelization of Murrieta Creek and its major tributaries and includes several concrete lined open channels and a small network of underground storm drains. The proposed system will carry storm runoff through the rapidly developing Murrieta Creek valley to outlet
 
 *232
 
 at the valley’s south end where Murrieta Creek and Temecula Creek confluence to form the Santa Margarita River.” The heart of the proposal was to provide “concrete lined sideslopes” along Murrieta Creek, Santa Gertrudis and Warm Springs Channels; other, smaller, open channels would have concrete bottoms. These include Lines F and F-l. The only references to Lines F and F-l are that two lines, so marked, appear on a large map which is part of the Master Plan, and costs for constructing those lines appear on a table entitled “cost summary.” The “Alternative Studies” section states “a number of alternatives were developed and studied for their hydraulic and economic feasibility.” The first paragraph of the “Recommendations” section urges: “The [Master Plan] be approved by [Riverside] as part of the overall master plan for the County.”
 

 In January 1986, Chief Engineer Edwards had prepared a CEQA “checklist,” or initial study, which stated part of the project was in the habitat of the Stephens’s Kangaroo Rat (Dipodomys Stephensi) a “State Rare” animal (Fulton,
 
 Smelling a Rat
 
 (Nov. 1997) 17 Cal.Law. 38-39 [photo]). This is
 
 not
 
 the recently notorious Tipton Kangaroo Rat (Dipodomys Nitratoides Nitratoides). (See Helvarg,
 
 Private—Keep Out
 
 (Apr. 1995) 15 Cal.Law. 30; Life on the Edge (1994) pp. 74, 78.)
 

 Fish and Game objected to the proposed negative declaration, in part due to the lack of any detailed environmental discussion. Chief Engineer Edwards defended the proposal, noting “before any portion of the Master Plan is constructed, a permit will be required from [Fish and Game], ... At that time, the individual project will be specifically identified (exact location and type of construction) allowing a precise environmental review along with any mitigations that may be necessary.”
 

 The negative declaration was adopted on May 6, 1986. In order to build Lines F and F-l, Riverside needed permission from Water Resources and Fish and Game, as “responsible agencies” (§ 21069), and the Army Corps of Engineers. In 1993 Riverside sought permission from these agencies.
 

 Apparently to satisfy the Army Corps of Engineers (Corps of Engineers), an environmental report prepared by Tierra Madre Consultants dated March 4, 1993, reviewed “the revised plans for the Murrieta Lines F and F-l creek channelization project.” Tierra Madre referred to a December 14, 1992, report which found “creek channelization would significantly impact riparian vegetation in the existing creekbed,” and described a “high potential that four sensitive raptors forage in the area encompassing the project site.” The report recommended leaving the bottoms natural and lining the sides with
 
 *233
 
 “armor-flex, rather than concrete.” However, the 1993 report concluded that because the project had been scaled back, such that areas containing significant habitat would be avoided, “Impacts [to specified locations] by creek channelization would not be considered significant.” This “shortening” indicates the project remained in flux.
 

 In April 1993, the Marines weighed in, complaining that the effects on Camp Pendelton had not been considered.
 

 The Corps of Engineers remained unsatisfied and, in a letter dated November 3, 1993, objected that impacts to vegetation and soil were not adequately assessed in the existing plans. “Fully lining these [natural tributaries] would result in a loss of all existing biological resources and would remove the potential for riparian habitat growing along these tributaries in the future. In order to minimize impacts to riparian habitat, we would like you to consider a natural, unlined channel bottom with rip-rap side slopes. An unlined channel bottom would reduce impacts, provide additional habitat value, reduce bank erosion, reduce flow velocity by allowing percolation into the ground and banks, enhance water quality treatment, increase water conservation benefits, and function as a flood control conduit.”
 

 In January 1994, the United States Department of the Interior, Fish and Wildlife Services, wrote to the Corps of Engineers, also objecting. “Concrete-lined channels not only fail to provide any habitat, but also serve to fragment the natural stream corridor, . . . [¶] The Service strongly believes that other less environmentally damaging practicable alternatives exist. . . . The Service recommends that the project be redesigned and constructed as a natural, earthen channel.” The United States Environmental Protection Agency (EPA) also opposed the project. The gist of its objection related to whether Riverside was entitled to proceed under a lenient “Nationwide Permit” or should be required to obtain the more onerous “Individual Permit,” due to the amount of damage to waters of the United States.
 

 Also in April 1994, the staff of the Regional Water Quality Control Board recommended insistence on an earthen channel for Line F. At various points Habitat wrote protest letters to Fish and Game, Water Resources and the Corps of Engineers.
 

 In September 1994, the City appointed a task force to consider a soft-bottom alternative. Several of the interested parties had -worked out a detailed memorandum of understanding in an effort to resolve the contested issues, an effort which ultimately failed but which animated several of the actions which followed. On October 4,1994, the City voted to approve a soft
 
 *234
 
 channel alternative. On October 26, 1994, the Army wrote to Water Resources, still opposing the concretization of the channels, but setting forth a possible compromise.
 

 On November 1, 1994, the City voted to permit concrete bottoms. In November 1994, the EPA wrote to the Corps of Engineers, reiterating that the project should be treated under the “Individual Permit” process, to facilitate efforts by the interested parties to settle the matter and “to allow for the evaluation of less damaging alternatives.” In October 1994, EPA had written to Water Resources, making essentially the same point.
 

 On November 10, 1994, Fish and Game opined that “Retention of a soft channel bottom and the resultant vegetation along these corridors is essential in providing travel, hiding and thermal cover for wildlife.” Accordingly, Fish and Game suspended the “Streambed Alteration Agreement” it had issued and asked Riverside to “redesign your flood control project to include a soft bottom channel.”
 

 Ultimately, on January 19, 1995, Fish and Game agreed to lift the suspension of the streambed alteration agreement in exchange for Riverside’s agreement to accept one of a set of conditions; ultimately, in a letter dated January 23, 1995, and accepted by Fish and Game on February 7, 1995, Riverside accepted the condition that it would protect treble the “off site” habitat as mitigation. Water Resources issued its Clean Water Act certification on January 11, 1995.
 

 Thus this case, filed on February 10, 1995, was filed within 30 days of approval by the 2 critical state responsible agencies. It appears that on February 17, 1995, the Corps of Engineers gave its approval, extracting compensation for the expected loss of six acres of waters of the United States in the form of preservation or restoration by Riverside of other lands.
 

 Trial Court Ruling
 

 On this evidence the trial court ruled as follows: “The Court finds: [¶] 1. The Master Drainage Plan for the Murrieta Creek Area and the accompanying Negative Declaration approved by the District on May 6, 1986, are inadequate project-specific documents under [CEQA] to implement the District flood-control project commonly known as ‘Lines F and F-l.’ [¶] 2. The Petition is not untimely and is not barred by the doctrine of laches.”
 

 The Appeal
 

 Riverside contends Habitat is seeking to challenge CEQA decisions which were made in 1986—long before the instant challenge was mounted.
 

 
 *235
 
 Riverside raises two principal issues, that Habitat failed to exhaust its administrative remedies and that Habitat brought this action too late. These issues are interrelated and depend on Riverside’s assumption that Habitat had to raise its challenges, if at all, when the 1986 Master Plan was approved. Habitat contends its challenge is timely because the decisions made in 1986 are broad policy decisions with which it has no disagreement, it is simply challenging a more recent decision on how to implement those broad policies. Habitat reasons that until specific plans for the flood control channels were proposed, Habitat had no need (and no ability) to challenge the general plan. When the specific plans were proposed, Habitat challenged them where it could in a timely manner, as counsel put it, they “weren’t just sitting on their behinds trying to booby trap the District.” The trial court accepted Habitat’s view, finding the Master Plan was “perfectly good as a plan, but it is not a project EIR at all.” We agree with the trial court.
 

 The trial court’s reference to “project EIR” signals the fact that this case turns on the concept of “tiering.” Throughout Riverside’s briefs runs the suggestion that the trial court manufactured a “new theory” for Habitat. Habitat did frame its petition as one to set aside the negative declaration, but pleaded the lack of an “adequate project description” and lack of environmental review for the construction of the specific project—Lines F and F-l within the Master Plan, which it pleaded were “distinct and separate projects from those addressed in the Master Drainage Plan for which no environmental documentation has been prepared, . . .” Its points and authorities made the theory clearer, and discussed “tiering.” At the hearing in the trial court Habitat made clear it did not oppose the channels; it opposed concrete bottoms to those channels
 
 without environmental review.
 
 We observe that the settlement with Fish and Game and Water Resources, which preceded any responsive pleading by Riverside, recites that those agencies will not rely on the 1986 negative declaration when considering future elements of the Master Plan. Thus second tier environmental review will be required as to any other portion of the Master Plan which Riverside chooses to construct. Riverside could not have been confused about the nature of the relief sought by Habitat in the trial court. Indeed, in its “statement of issues” in the trial court (§ 21167.8, subd. (f)), Riverside formally alleged “Lines F and F-l are not a ‘separate project’ for purposes of CEQA.” In our view the trial court did not manufacture a new legal theory for Habitat, it merely dispersed smoke from the field by emphasizing a concept contained, though obscured, in the pleadings.
 

 Tiering
 

 The concept of “tiering” is explained in detail in our opinion,
 
 Koster
 
 v.
 
 County of San Joaquin
 
 (1996) 47 Cal.App.4th 29, 36-37 [54 Cal.Rptr.2d 565], as follows:
 

 
 *236
 
 “ ‘Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.’ ([Cal. Code Regs., tit. 14 (hereafter Guidelines)], § 15004, subd. (b).) [*]] ‘[T]iering is a process by which agencies can adopt programs, plans, policies, or-ordinances with EIRs focusing on “the big picture,” and can then use streamlined CEQA review for individual projects that are consistent with such . . . and ... are consistent with local agencies’ governing general plans and zoning.’ (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) [(8th ed. 1994) The EIR Process,] p. 234, col. b.)
 

 “ ‘ “Tiering” refers to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared. Tiering is appropriate when the sequence of EIRs is: [¶] (a) From a general plan, policy, or program EIR to a program, plan, or policy EIR of lesser scope or to a site-specific EIR.’ (Guidelines, § 15385; see §§ 21068.5, 21093 [express policy is to avoid ‘repetitive discussions of the same issues in successive’ EIR’s and ensure later EIR’s ‘are consistent with a previously approved policy’ so as to ‘concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project’]; Guidelines, § 15152 [same];
 
 Sierra Club
 
 v.
 
 County of Sonoma
 
 (1992) 6 Cal.App.4th 1307, 1318-1319 [8 Cal.Rptr.2d 473].)
 

 “In practice the first ‘tier’ may consist of a general plan or program EIR, which discusses agency-wide programs, policies and cumulative impacts. The second tier may consist of a specific plan EIR, which discusses a particular region within the agency. The third tier may consist of an ordinary development project EIR, which discusses a particular site. [Citation.]”
 

 Koster
 
 v.
 
 County of San Joaquin, supra,
 
 47 Cal.App.4th 29 presents something of a mirror image to this case. The legal position of the lead agency in
 
 Koster
 
 was that an attack on a portion of a general plan favoring new town growth was premature, because the new towns would be the subject of further environmental review when the next “tier,” was reached. We rejected that theory because the challengers wanted to attack the finding favoring new town growth, not the specifics of the new town.
 

 Another case of interest is
 
 Al Larson Boat Shop, Inc.
 
 v.
 
 Board of Harbor Commissioners
 
 (1993) 18 Cal.App.4th 729 [22 Cal.Rptr.2d 618]. In that case
 
 *237
 
 the “master plan” covered harbor improvements over a five-year plan, and included a discussion of six possible projects. The Court of Appeal upheld an environmental impact report (EIR) which
 
 did not
 
 cover those projects, because in the EIR “the Board committed itself to ‘conduct individual environmental assessments in accordance with CEQA on a project-by-project basis for each of the indicated projects.’ ” (18 Cal.App.4th at p. 742.) Consideration of alternatives to the projects was properly deferred until that later, second-tier, environmental review.
 
 (Id.
 
 at pp. 742-743, see
 
 Stand Tall on Principles
 
 v.
 
 Shasta Union High Sch. Dist.
 
 (1991) 235 Cal.App.3d 772 [1 Cal.Rptr.2d 107].) In contrast, although the Master Plan here alluded to further environmental review (and itself discussed no alternatives to the project), when the time came, no such review was done.
 

 In this case, the challenger, Habitat, did not object to the Master Plan, or first tier. But when Riverside finally decided how it wished to implement the plan, specifically, exactly in what manner it would construct Lines F and F-l, Habitat pointed out issues which had never received environmental review. Riverside’s attempt to characterize those issues as legally settled because they had not been raised before is not persuasive. Had Habitat raised its present challenge in 1986, it would have been rebuffed as premature.
 

 Exhaustion of Administrative Remedies
 

 Riverside contends that because Habitat never presented the CEQA violations to Riverside, the doctrine of exhaustion of remedies bars Habitat from seeking judicial relief. We disagree.
 

 “Under the exhaustion doctrine, ‘where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.’
 
 (Abelleira
 
 v.
 
 District Court of Appeal
 
 (1941) 17 Cal.2d 280, 292 . . . .) This is a jurisdictional prerequisite, not a matter of judicial discretion
 
 (id.
 
 at p. 293), and applies to actions seeking both ordinary and administrative mandamus [citation]. The exhaustion doctrine is codified in CEQA in [section] 21177.”
 
 (City of Sacramento
 
 v.
 
 State Water Resources Control Bd.
 
 (1992) 2 Cal.App.4th 960, 969 [3 Cal.Rptr.2d 643], fn. omitted.)
 

 Section 21177 provides as follows: “(a) No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project .... [¶] (b) No person shall maintain an action or proceeding unless that person
 
 *238
 
 objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project. . . . [¶]. . . [¶] (e) This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law.”
 

 The Legislature states this statute was designed to codify the exhaustion of remedies doctrine, but not “to limit or modify any exception . . . contained in case law.” (Stats. 1984, ch. 1514, § 14.5, p. 5345.) The statute itself proclaims that it does not apply “to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, or if the public agency failed to give the notice required by law.” (§ 21177, subd. (e).) This is a codification of a major judicial exception to the doctrine: “The exhaustion requirement is not applicable where an effective administrative remedy is wholly lacking. . . . ” (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 314, p. 404, citations omitted; 2 Kostka et al., Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1996) Judicial Review, § 23.101, p. 1016.)
 

 In this case Riverside obviously gave no notice and provided no opportunity to be heard on the question of a “second tier” EIR review, because its adamant position is that no “second tier” review is necessary. Because, as we have explained, Riverside is mistaken on that count, it is mistaken in its view that Habitat failed to exhaust its remedies.
 

 Over and over in its briefs Riverside complains that Habitat knew what it was planning to do long before February 1995, when it filed suit, and repeatedly states or implies that Habitat should have brought its objections to Riverside’s attention. Tellingly, absent from Riverside’s briefs is any explanation of where, when and how Habitat could raise anything in the administrative forum, when Riverside provided no such forum. Riverside simply points to the hearings held in 1986, which led to the negative declaration. In this case the “alleged grounds for noncompliance” with CEQA consist of the failure to engage in second tier review and as to that issue “there was no public hearing or other opportunity” for Habitat to be heard
 
 by Riverside
 
 therefore the exhaustion of remedies doctrine is inapplicable under the plain language of section 21177, subdivision (e).
 

 As an aside, we confess we are mystified by Riverside’s strategy in this case. The record demonstrates that Habitat complained to every administrative body that did provide a forum: Fish and Game, Water Resources, and
 
 *239
 
 the Corps of Engineers. Those agencies, as well as the United States Fish and Wildlife Service and EPA, all pointed out the total lack of environmental information underlying the negative declaration and pointed out serious environmental issues worthy of intelligent debate by the decisionmaking body.
 

 Yet rather than heeding those warnings then, Riverside now attempts to turn this point
 
 against
 
 Habitat, by claiming “Petitioners availed themselves of the opportunity to submit similar written objections to [Fish and Game, Water Resources and the Army]. [Citations.] Petitioners could have easily pursued a similar course with [Riverside], ...” Later Riverside states “under the threat of litigation, [Riverside] might have agreed to prepare the environmental analysis that Petitioners now seek on appeal. Petitioners ignored that possibility before they filed the Petition and they ignore it on appeal.” But, as stated above, Riverside, unlike the other agencies, provided no forum in which such objections could be lodged. Was Habitat simply to write letters to the individual board members? Since Riverside obviously knew about Habitat’s challenges to the various other agencies, why shouldn’t it have scheduled a meeting to consider the objections, or at least, formally accepted comments on the issues posed?
 

 Riverside emphasizes the purpose of the exhaustion requirement, which is to give the agency an opportunity to consider issues before they get to court. The leading case on this judicially created doctrine rejected the position of a party who claimed “an asserted right to judicial interference with an administrative proceeding before it became final, and hence impliedly claimed a right to interfere in the middle or the beginning, or even before any such proceeding was commenced. This attitude challenges judicial practices of long standing. The courts have repeatedly recognized the necessity of placing the numerous and complex problems arising under statutes of the type involved herein in the hands of expert bodies, familiar with the subject matter through long experience. They have pointed out that to permit the initial consideration of these matters by the courts would not only preclude the efficient operation of the acts, but would overwhelm the courts with cases of a technical, specialized character, and seriously impair their capacity to handle their normal work.”
 
 (Abelleira
 
 v.
 
 District Court of Appeal
 
 (1941) 17 Cal.2d 280, 305-306 [109 P.2d 942, 132 A.L.R. 715].) In this case there was no administrative proceeding to interrupt. There is nothing in the purpose of the doctrine which suggests it is designed to encourage agencies to bury their heads in the sand. Indeed, an opinion of this court cited by the leading treatise (Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (9th ed. 1996) Jud. Review 380-381), points out that “Ordinarily we
 
 *240
 
 use the word remedy as meaning a device to redress a wrong.”
 
 (California Aviation Council
 
 v.
 
 County of Amador
 
 (1988) 200 Cal.App.3d 337, 348 [246 Cal.Rptr. 110] (conc. opn. of Blease, J.).) Here, the action taken, proceeding to complete second tier construction without a second tier CEQA review, was taken without providing any “device,” meaning no notice or public participation, to rectify the error.
 

 Habitat, upon learning the precise plans for the channels, complained loudly and clearly to every agency which was receptive to comments. Riverside held no meeting to consider the specific plans challenged in this case. In such circumstances, this suit is not barred by the exhaustion doctrine.
 

 In the reply brief Riverside maintains that because the “tiering” contention did not solidify until the trial court proceedings, Habitat cannot avail itself of the statutory exception to the exhaustion requirement. Riverside states that Habitat had “numerous opportunities” to object to Riverside, but again points to no mechanism for the receipt of such objections. Later, taking out of context a suggestion by amicus curiae, California Association of Counties, that under the Ralph M. Brown Act, members of the public may address any legislative body “on any item of interest to the public,” Riverside reads out of the statute the following words “before or during the legislative body’s consideration of the item, that is within the subject matter jurisdiction of the legislative body, . . .” (Gov. Code, § 54954.3, subd. (a).) There is nothing in the record which supports the claim that Riverside holds “weekly public hearings” as Riverside claims and, more importantly, there is nothing in the record to suggest that it ever held a hearing on the “item of interest to the public” at issue in this case. The only meeting amicus curiae pointed to was the meeting prior to letting the contract for construction, a meeting which occurred after the instant lawsuit was filed.
 

 Statute of Limitations
 

 The relevant statute, section 21167, provides in part: “Any action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows: [¶] (a) An action or proceeding alleging that a public agency is carrying out or has approved a project which may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days from the date of the public agency’s decision to carry out or approve the project, or, if a project is undertaken without a
 

 
 *241
 
 formal decision by the public agency, within 180 days from the date of commencement of the project. [¶] (b) Any action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days from the date of the filing of the notice required by subdivision (a) of Section 21108 or subdivision (a) of Section 21152.” (See also Cal. Code Regs., tit. 14, § 15112, subd. (c).)
 

 Again Riverside maintains the relevant “trigger” date is May 7, 1986, when the negative declaration and notice of determination were filed. We disagree for the reasons already stated regarding the exhaustion doctrine. The filing of the notice of determination regarding the negative declaration
 
 did
 
 start a clock running as to challenges to the negative declaration. (§ 21167, subd. (b).) This case does not challenge that determination. The broad conceptual plan for dealing with flooding in the Murrieta area is not at issue, it is the specific implementation of that broad plan which is challenged herein.
 

 The trial court reasoned that since no formal
 
 site-specific
 
 decision on the F and F-l Lines was ever taken by Riverside, the statute of limitations did not begin to run until commencement of the project, which occurred after the filing of this lawsuit. We agree with the trial court. Although Riverside characterizes this position as “nonsense,” it fits within the statutory scheme quite logically. Since Riverside never took any steps regarding second-tier review, the only trigger event is when construction began on the second-tier part of the project. Riverside’s claim that the project “commenced” long before the contracts were signed assumes “commence” means something other than “begin work on.”
 

 But even if we disagreed with the trial court, the applicable limitations period would run, at the earliest, on “the date of the public agency’s decision to carry out or approve the project,” under section 21167, subdivision (a).
 

 As to this prong of the statute of limitations, Riverside contends that the “discovery rule” bars the action because Habitat knew or should have known of the specific plans for the F and F-l lines more than 180 days before filing this action. As in other “discovery” contexts, the limitations statute runs from the date “the plaintiff knows or should have known” that the project violated CEQA.
 
 (Concerned Citizens of Costa Mesa, Inc.
 
 v.
 
 32nd Dist. Agricultural Assn.
 
 (1986) 42 Cal.3d 929, 932-933, 939 [231 Cal.Rptr. 748, 727 P.2d 1029].)
 

 We are not persuaded that Habitat waited too long to file this suit. Habitat’s primary complaint with the second tier plan is that the channel
 
 *242
 
 bottoms should be “soft,” not concrete. As late as October 1994, the question was not resolved. The City voted to approve soft channels on October 4, 1994. It was not until November 1,1994, that the City changed its mind and approved concrete channels. Moreover, even at that point it was unclear whether Riverside could proceed. It was not until Riverside accepted the mitigation conditions placed on it by both Fish and Game and the Corps of Engineers that it was in a position to proceed. This suit was timely.
 

 It is true that Riverside wanted concrete channels throughout the process. However, we cannot fault Habitat for attempting to change that result before running into court. As stated above, Habitat complained loudly to every agency that would listen to halt the project. As late as October 1994 it effectively prevailed, by convincing the City to approve soft channels, not concrete channels. There is no purpose in requiring a party to file a lawsuit when the controversy has not solidified. Put another way, until it was certain that the channels were going to be built in certain locations with a certain structure (namely, concrete bottoms) Habitat did not “know” that any CEQA challenge was necessary. As we stated in a related context, changes in a project description “vitiate the . . . process as a vehicle for intelligent public participation.”
 
 (County of Inyo
 
 v.
 
 City of Los Angeles
 
 (1977) 71 Cal.App.3d 185, 197 [139 Cal.Rptr. 396].) “A curtailed, enigmatic or unstable project description draws a red herring across the path of public input.”
 
 (Id.
 
 at p. 198.) As a corollary, “an accurate, stable and finite project description is the
 
 sine qua non
 
 of an informative and legally sufficient EIR.”
 
 (Id.
 
 at p. 199.)
 

 We agree with Habitat that accepting Riverside’s arguments would be antithetical to CEQA because “citizen groups would be required to file lawsuits before they know the stable, finite, final project description, for fear that if they did not, they would be barred by the statute of limitations. Such an application of the ‘discovery rule’ would not only instill public distrust in government agencies, but would also thwart attempts to resolve disputes concerning the design of a project.” The purpose of CEQA is to inform the public of plans, so that the public can help guide decision makers about environmental choices. It is not the purpose of CEQA to foment prophylactic litigation.
 

 In some cases a project is challenged at the first tier, for lack of sufficient environmental information basic to the whole project, such as whether new towns should exist
 
 (Koster)
 
 or where the water for a new residential community will come from.
 
 (Stanislaus Natural Heritage Project
 
 v.
 
 County of Stanislaus
 
 (1996) 48 Cal.App.4th 182 [55 Cal.Rptr.2d 625].) But this does not mean that because the first tier sails through without challenge that the
 
 *243
 
 second tier is thereby immune from review, simply because it was envisioned, in general terms, in the first tier.
 

 The fact that other aspects of the Master Plan were constructed without challenge is irrelevant.
 

 Riverside’s suggestion in a footnote that laches should bar this suit is waived. (See
 
 Landa
 
 v.
 
 Steinberg, supra,
 
 126 Cal.App. at p. 325.)
 

 The Cross-appeal
 

 After the trial court announced its decision the parties were unable to agree on language in the judgment. Riverside prepared a judgment which made no mention of a return on the writ. Habitat objected and offered a proposed judgment which included the following language: “This Court shall retain jurisdiction, and pursuant to Public Resources Code section 21168.9(b), require a return to this Court’s Peremptory Writ of Mandate setting forth the actions taken by the District to comply with this Court’s mandate.”
 

 The judgment granting the writ, in relevant part, provides: “The Petition for Writ of Mandate is granted, insofar as [Riverside], in proceeding with the implementation of the [project], must comply with [CEQA].” It does not appear any writ was prepared. Habitat correctly contends that the judgment should specify that the writ include provisions for a return on the writ.
 

 In its defense of the judgment, counsel for Riverside overlook the teaching of the leading treatise: CEQA “requires that, after issuing a writ, the trial court must retain jurisdiction over the matter until it has determined that the agency has adequately complied with CEQA.” (Remy et al., Guide to the Cal. Environmental Quality Act,
 
 supra,
 
 Jud. Review, p. 428, col. a, citations omitted.) The treatise points out that the best-known example of such continuing jurisdiction is this court’s efforts (concluded in 1997) to obtain compliance with a 1973 writ controlling Owens Valley groundwater. “A peremptory writ of mandate does not necessarily exhaust the court’s authority; where it does not provide complete relief, the court may continue the lawsuit and make such interim orders as the case may require. [Citation.] In the absence of a final judgment we retain jurisdiction over the parties and subject matter, as well as ancillary jurisdiction to award costs.”
 
 (County of Inyo
 
 v.
 
 City of Los Angeles
 
 (1978) 78 Cal.App.3d 82, 85 [144 Cal.Rptr. 71]; see also Bass et al., CEQA Deskbook (1996) CEQA Litigation, p. 129.)
 

 
 *244
 
 A writ of mandate is a piece of paper. If its purpose is to declare the rights of parties, its existence suffices. If its purpose is to compel someone to
 
 do
 
 something, its existence does not suffice. The proper way to ensure compliance is to require a return on the writ, which commands a party to do something and report to the court that the act has been done. (See Cal. Administrative Mandamus (Cont.Ed.Bar 1989) Procedures After Trial, §§ 13.10-13.11, pp. 411-414 [providing form for this purpose].)
 

 CEQA contains a specific provision on this point. Section 21168.9, subdivision (b) provides in relevant part that “The trial court shall retain jurisdiction over the public agency’s proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division.” A form judgment and form peremptory writ of mandate specific to CEQA cases, which include the issue omitted herein, are readily available. (2 Kostka et al., Practice Under the Cal. Environmental Quality Act,
 
 supra,
 
 Judicial Review, §§ 23.165 to 23.166.)
 

 Riverside faults Habitat by pointing out, correctly, that the judgment is not a writ, the writ is issued by the clerk, and that Habitat should have prepared a proposed writ containing the desired language. Although Habitat’s briefs evidence confusion regarding the difference between a
 
 judgment granting a writ
 
 and a
 
 writ,
 
 such confusion does not detract from the thrust of its argument. The clerk has no discretion to draft writs which exceed the scope of the judgment. (See
 
 Palma
 
 v.
 
 U.S. Industrial Fasteners, Inc.
 
 (1984) 36 Cal.3d 171, 181 [203 Cal.Rptr. 626, 681 P.2d 893] [referring to issuance of writ as a “ministerial function of the clerk”].) As a corollary to this point, the trial court has a duty to explain exactly what the writ should contain. The writ, in this case should require a return.
 

 Riverside contends that the trial court has continuing jurisdiction whether or not the judgment recites that fact. Given this concession, we fail to understand why Riverside objects to clarification of the judgment.
 

 Finally, Riverside maintains that if it were to file a return, it would simply state that it had filed an appeal. That would have been proper until the appeal was concluded. (Cal. Administrative Mandamus,
 
 supra,
 
 Procedures After Trial, § 13.14, p. 415.) But
 
 after
 
 the appeal there should be an extant writ providing for a return, and a future return stating that Riverside had filed
 
 and lost
 
 an appeal would be improper.
 

 Disposition
 

 The judgment granting the writ of mandate is modified by the addition of the following language: The court retains jurisdiction to ensure compliance
 
 *245
 
 with this judgment. The writ shall command that a return be filed on or before [date]. The judgment, as modified, is affirmed. Habitat shall recover costs.
 

 Sims, Acting P. J., and Davis, J., concurred.