[No. C010513. Third Dist. Oct. 28, 1991.]

STAND TALL ON PRINCIPLES, Plaintiff and Appellant, v.
SHASTA UNION HIGH SCHOOL DISTRICT et al., Defendants and
Respondents.

**COUNSEL**

Mayer & McNeill, Mayer, McNeill & Martinez and Walter P. McNeill for Plaintiff and Appellant.

Moss & Enochian and John Sullivan Kenny for Defendants and Respondents.

OPINION

DAVIS, J.—The issue presented by this appeal is whether the California Environmental Quality Act (CEQA) requires that a school district complete an environmental impact report (EIR) during the course of selecting a site for a new high school, or whether it is sufficient if the district completes an EIR prior to acquiring such a site. "It is circumstance and proper timing that give an action its character and make it either good or bad." (Plutarch, *Life of Agesilaus II*, Lives, § 23.) Here, we hold that it is sufficient if a school district completes an EIR prior to acquiring a site for a new high school as long as that EIR genuinely and thoroughly assesses all reasonable alternative sites. Accordingly, we affirm the judgment.

### BACKGROUND

Pursuant to a "Master Plan" it adopted in 1987, the Shasta Union High School District (District) determined it needed a new four-year high school. The proposed new school was a $16 million facility that would encompass nearly 40 acres and an eventual student population of 1,800.

The Board of Trustees of the District (Board) appointed a site selection committee (Committee) in May 1989 to review potential sites for the new high school. The Committee was comprised of school administrators, trustees and employees of the District and of the elementary school districts that would be sending students to the new school. The criteria for the review of the potential sites encompassed a number of environmental considerations, including traffic, zoning compatibility, sewage disposal, off-site street impacts, toxic wastes, hazardous substances, soil conditions, and topography. The purpose of the Committee was to "arrive collectively at a decision regarding [the] site for a new high school" and "build a case so that the State decision coincides with the choice of the [C]ommittee." (According to the record, the state acts in an advisory role and tells the District what sites it cannot select rather than what sites it can; under this procedure, the state had approved three sites.)

In September 1989, the Committee had winnowed the potential sites from nine to five and the District proceeded with a preliminary architectural and engineering review. In October 1989, the state advised eliminating two of the five sites, which the District did in November. Thereafter, in the spring of 1990, the District selected a single site out of these "top" three sites; the state deemed the District's "first choice" acceptable, "assuming no problems surface during the other upcoming activities, such as the environmental impact review, geological survey or the professional land value appraisals."

Throughout this opinion, we will refer to the District's selected site as its "preferred site." By using the term "preferred site," we recognize the District has selected the site it wants but we also recognize that such a selection is, as relevant here, contingent upon completion of the EIR process and final state approval.

The preferred site encompasses 115 acres in the Palo Cedro area, 9 miles east of Redding. Although the proposed new high school would occupy only 40 of these 115 acres, the District indicated it might purchase the entire site.

Up to this point, the District had not formally solicited communitywide input although it had sent newsletters in January 1990 and May 1990 to parents of children in the new high school area advising them about the site selection process, and newspaper articles on the process had appeared. The Board adopted a policy in May 1990, which specified the Board "shall solicit community input whenever a school site is to be selected." The District acknowledged in the summer of 1990, however, that residents living near the preferred site had not yet been consulted "because the [D]istrict has been waiting for the appropriate time." As the District explained: "There are many steps that must be completed before the state gives approval. These are now starting to come to closure. This does not mean there was no intent to hear and seriously consider local resident concerns. Rather, it was believe[d] that this would be best done during the [EIR] process, which will begin shortly."

The District and Committee in August 1990 held a public hearing to allow residents living near the preferred site to voice their objections. The residents presented petitions they said contained nearly 400 signatures opposing the site, and 24 residents spoke. Prior to this hearing, these residents had also proposed three new sites. The state consultant and the District's architect had reviewed these three sites and, based on their advice, the Committee rejected the trio. The Committee then unanimously reaffirmed the preferred site as the Committee's first choice and the District superintendent explained the next step would be preparation of an EIR.

In September 1990, the Board passed two resolutions regarding the site. In Resolution No. 8335, the Board accepted the Committee's recommendation to use the preferred site for the new high school. In Resolution No. 8336, the Board authorized the District's administration to make a formal offer "to purchase property for the new school"; under this resolution, any such offer was to be made contingent upon completion of the EIR process and final state approval.

In letters sent to firms requesting they bid on the EIR preparation, the District stated, "Site selection is complete and the . . . Board has taken action to approve the site." Shortly after this, a local Realtor informed the District of a presently listed 120-acre site he thought suitable for the new high school. Responding to this proposal, the District stated: "After a selection process of nearly one and a half years, the Board of Trustees has chosen a site in Palo Cedro. We will, however, keep your letter on file, in the event we are unable to acquire the selected site."

In October 1990, an unincorporated association of Palo Cedro residents and landowners, Stand Tall On Principles (STOP), petitioned the Shasta County Superior Court for a writ of mandate. In that petition, STOP requested that the court vacate Resolution Nos. 8335 and 8336, order the site selection process reopened to consider environmental impacts under the CEQA procedure, and enjoin the District from purchasing the preferred site.

The trial court denied STOP's petition, reasoning that an EIR will precede acquisition of a new high school site, that such an EIR must include an environmental analysis of alternative sites, and that the EIR for this project must be site-specific for appropriate environmental review to take place. This appeal followed.

## DISCUSSION

On appeal, STOP contends that CEQA requires that a high school district prepare an EIR prior to an official decision selecting a new high school site from among various alternatives. In support of this contention, STOP argues "[t]here can be no serious dispute that selection of the site is probably the most environmentally critical decision of a project to develop a new high school."[1]

As noted, the critical issue in this case is not whether an EIR has to be prepared—that much is conceded; rather, the critical issue is *when* an EIR has to be prepared. STOP contends that if the District's position is adopted, the forthcoming EIR will be a meaningless document used to rationalize or justify the site already chosen. The District counters that it must have a site *in mind to undertake a focused and meaningful EIR and that the CEQA*

---

[1]Frequently in its arguments, STOP employs the term "environmental review" rather than "EIR." It is clear from the context of this case, however, that STOP seeks an EIR. All parties concede the project encompassing this new high school requires an EIR. (See *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 999-1000 [165 Cal.Rptr. 514] (*Friends of "B" Street*).)

scheme protects STOP by requiring an analysis of alternative sites in the EIR. Our review of the relevant legal principles convinces us that the District has the better argument. Those principles are as follows.

■ With narrow exceptions, CEQA (Pub. Resources Code, § 21000 et seq.; all further references to undesignated statutory sections are to the Public Resources Code) requires government agencies to prepare or contract to prepare an EIR for any project they carry out or approve which "may have a significant effect on the environment." (§ 21151; *Friends of "B" Street, supra,* 106 Cal.App.3d at p. 999.) Our Supreme Court has stated that "the Legislature intended [][CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049] (*Friends of Mammoth*); see also *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

The crux of the issue here involves alternative sites and the timing of an EIR. ■ As for alternative sites, "[t]he Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; *and to indicate alternatives to such a project.*' " (*Laurel Heights, supra,* 47 Cal.3d at p. 391, quoting § 21061, italics added; see also § 21002.1, subd. (a): "The purpose of an [EIR] is to identify the significant effects of a project on the environment, *to identify alternatives to the project,* and to indicate the manner in which those significant effects can be mitigated or avoided." (Italics added.).) "The core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*).) "A *major* function of an EIR is 'to ensure that *all reasonable alternatives* to proposed projects are *thoroughly assessed* by the responsible official' or board." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 203 [139 Cal.Rptr. 396], quoting *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 197 [132 Cal.Rptr. 377, 553 P.2d 537], italics added; see also *Goleta Valley, supra,* 52 Cal.3d at pp. 565-566.)

As noted in *Goleta Valley,* "[t]hese statutory and judicial concepts are carried forward in the Guidelines [Cal. Code Regs., tit. 14, § 15000 et seq.], which state that an EIR must '[d]escribe a range of reasonable *alternatives to the project, or to the location of the project,* which could feasibly attain the

basic objectives of the project, and evaluate the comparative merits of the alternatives." (52 Cal.3d at p. 566, quoting Guidelines, § 15126, subd. (d), italics in original.)[2] Regarding Guidelines, section 15126, subdivision (d), *Goleta Valley* continues: "As the underscored language suggests, project alternatives typically fall into one of two categories: on-site alternatives, which generally consist of different uses of the land under consideration; and off-site alternatives, which usually involve similar uses at different locations." (52 Cal.3d at p. 566.)

■ Where these general principles regarding alternatives apply—as they clearly do to the eventual project of this new high school site—it is obvious that one of the primary functions of an EIR is to assess thoroughly all reasonable alternative sites.

■ As for the issue of when to prepare an EIR, it has been said that "[t]he timing of an environmental study can present a delicate problem." (*Fullerton Joint Union High School Dist.* v. *State Board of Education* (1982) 32 Cal.3d 779, 797 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton* v. *State Board*).) "[T]he question of timing of the preparation of an EIR [is] basically an administrative decision to be made by a public agency consistent with the overall objectives of CEQA." (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 36 [143 Cal.Rptr. 365] (*Mount Sutro*).) "[I]n order to achieve the salutary objectives of CEQA the determination of the earliest feasible time to [prepare an EIR] is to be made initially by the agency itself, which decision must be respected in the absence of manifest abuse. (§ 21168.5; *No Oil, Inc.* v. *City of Los Angeles* [1974] 13 Cal.3d 68, 88 [118 Cal.Rptr. 34, 529 P.2d 66].)" (*Id.* at p. 40.) Such an abuse is shown if the agency fails to proceed in a manner required by law. (*Id.* at p. 37.)

■ These principles regarding alternatives and timing must be considered in light of the fundamental purpose of CEQA, which is to ensure "that environmental considerations play a significant role in governmental decision-making." (*Friends of Mammoth, supra,* 8 Cal.3d at p. 263; *Fullerton* v. *State Board, supra,* 32 Cal.3d at p. 797.) Accordingly, "[c]hoosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs . . . should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental

---

[2]All references to "Guidelines" are to the state CEQA Guidelines, which are administrative regulations implementing CEQA. (*Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. 2.) At a minimum, courts should afford great weight to a Guideline unless it is clearly unauthorized or erroneous under CEQA. (*Ibid.*)

assessment. [¶] (1) With public projects, at the earliest feasible time, project sponsors shall incorporate environmental considerations into project conceptualization, design, and planning. CEQA compliance should be completed prior to acquisition of a site for a public project." (Guidelines, § 15004, subd. (b)(1).)

Given that the District here must thoroughly assess all reasonable alternative sites in its EIR, we cannot say the District manifestly abused its discretion in deciding to prepare an EIR after it had selected the preferred site. A certain harmony in line with the fundamental purpose of CEQA is achieved by not judicially disrupting the timing sequence at issue here. Under that sequence, STOP and the public are afforded a thorough assessment in the EIR of all reasonable alternative sites while the District's discretion is preserved over the delicate problem of deciding when to prepare the EIR.

STOP rejects the above analysis. As noted previously, STOP asserts "that selection of the site is probably the most environmentally critical decision of a project to develop a new high school." In effect, STOP contends the District's selection of the preferred site constitutes the "approval" of a "project" for which an EIR must be done. (§ 21151; *Friends of "B" Street, supra,* 106 Cal.App.3d at p. 999.) We disagree with STOP on this point.

" 'Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. . . ." (Guidelines, § 15352, subd. (a).) " 'Project' means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . . [¶] [For a]n activity directly undertaken by any public agency [the term 'project'] includ[es] but [is] not limited to public works construction and related activities[,] clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700." (Guidelines, § 15378, subd. (a)(1).)

Here, the Board's resolutions regarding the site selection do not constitute an "approval" under CEQA because they do not commit the District to a *definite course* of action since they are expressly made contingent on CEQA compliance. As the trial court aptly noted, " 'approval' of the site by the District is conditioned upon compliance with CEQA." Nor does the definition of "project" support STOP's position. A "project" means "the

*whole* of an action," but again, the action of selecting the preferred site here is expressly conditioned upon CEQA compliance. Moreover, the examples provided in the "project" definition for an "activity directly undertaken by [a] public agency" are not akin to a contingent site selection. (See Guidelines, § 15378, subd. (a)(1), quoted above.)

Some recently enacted statutes support our conclusion that a contingent selection of a schoolsite does not constitute a "project approval" for which an EIR is required. Under Education Code section 39003, enacted in 1990, "[t]he governing board of a school district shall not *approve* a *project* involving the *acquisition* of a *schoolsite* by a school district unless" the lead agency determines that the project site is not: (1) "[t]he site of a current or former hazardous waste disposal site or solid waste disposal site . . ." (2) a "hazardous substance release site . . ." or (3) "[a] site which contains one or more pipelines . . . which carries hazardous . . . materials . . . ." (Italics added.) A companion statute, Public Resources Code section 21151.8, provides in pertinent part that "[n]o [EIR] . . . shall be approved for any *project* involving the *purchase* of a *schoolsite* or the *construction* of a new elementary or secondary school by a school district unless the [EIR] . . . includes information which is needed to determine if the property proposed to be purchased, or to be constructed upon" is any of the three sites described in Education Code section 39003. (Italics added; see also §§ 21151.3, 21151.4.)

Of course, we do not base our decision on these statutory and judicial snippets. They merely illustrate the nature of a "project" in the context of a site selection process for a new school. A more important factor in our analysis is how STOP's environmental review proposals would interact with CEQA's premise that "EIRs . . . should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Guidelines, § 15004, subd. (b).) As recognized in that Guideline, "[c]hoosing the precise time for CEQA compliance involves a balancing of competing factors." (*Ibid.*)

If STOP contends an EIR is required for all potential sites encompassed in a site selection process, that EIR may prove too cumbersome and yield little of value given its lack of focus. If STOP contends an EIR is required for certain sites on which a school district is more specifically focused, that process is not amenable to rational demarcation and would yield little of value given its unclear focus. ■ But, alas, if STOP contends an EIR is required prior to the ultimate selection of a particular site, that in effect is what is going to occur here when the District prepares the EIR on its

preferred site in the context of a genuine and thorough assessment of all reasonable alternative sites. To us, this last option strikes the right balance in this case. We stress, however, that the EIR we envision must serve in a practical sense as an important contribution to the decisionmaking process and must not be used to rationalize or justify a decision already made.

The balance we have struck is supported by a number of authorities, not the least of which are the decisions mandating that an EIR contain a thorough assessment of all reasonable alternative sites. (See *Laurel Heights, supra,* 47 Cal.3d at pp. 399-407; *Goleta Valley, supra,* 52 Cal.3d at pp. 564-576; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738, 750-753 [202 Cal.Rptr. 423]; *Citizens of Goleta Valley* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1177-1180 [243 Cal.Rptr. 339]; see also *Methow Valley Citizens Council* v. *Regional Forester* (9th Cir. 1987) 833 F.2d 810, 815-820; Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (1991) pp. 204-215.)

Support for the balance we have struck is found not only in these decisions but also in the CEQA Guidelines. Guidelines, section 15004, governing the "time of preparation" of an EIR, provides that "CEQA compliance should be completed prior to *acquisition* of a site for a public project" (italics added); it does not say "prior to *selection* of a site." (Guidelines, § 15004, subd. (b)(1).) Guidelines, section 15126, mandates that an EIR "[d]escribe a range of reasonable alternatives to the project, *or to the location of the project,* which could feasibly attain the basic objectives of the project and evaluate the comparative merits of the alternatives." (Guidelines, § 15126, subd. (d), italics added; see also Guidelines, § 15126, subd. (d)(5).) Guidelines, section 15082, mandating that the agency preparing an EIR notify other relevant agencies of the project, provides in pertinent part: "The notice of preparation shall provide the responsible agencies with sufficient information describing the project and the potential environmental effects to enable the responsible agencies to make a meaningful response. At a minimum, the information shall include:  [¶] (A) Description of the project, [¶] (B) *Location* of the project indicated either on an attached map (preferably a copy of a U.S.G.S. 15' or 7 1/2' topographical map identified by quadrangle name, or by a street address in an urbanized area), and [¶] (C) Probable environment effects of the project." (Guidelines, § 15082, subd. (a)(1); italics added.) Complying with this mandate is obviously difficult absent a particular site. Even more significantly, Guidelines, section 15382, defines a "significant effect on the environment"—which triggers the preparation of an EIR (*Friends of "B" Street, supra,* 106 Cal.App.3d at pp. 999-1000)—as "a substantial, or potentially substantial, adverse change in any of the physical conditions *within the area affected by the project* including land,

air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Italics added.)

This does not mean that a particular site is an EIR prerequisite. For example, Guidelines section 15385, defines the concept of "tiering" as encompassing "the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared." (See also Guidelines, §§ 15160-15170, delineating the "Types of EIRs.") In the context of selecting a new high school site, however, the Guidelines that refer to a specific site, location or area seem more relevant. Viewed in this way, we cannot say the District abused its discretion in selecting the preferred site before preparing an EIR. As we have made clear, that EIR must analyze the preferred site as well as all reasonable alternative sites.

STOP relies on *Realty Income Trust* v. *Eckerd* (D.C.Cir. 1977) 564 F.2d 447 and *Fullerton* v. *State Board, supra*, 32 Cal.3d 779 to argue that an EIR is required during the process of selecting the preferred site. Neither case persuades us to alter the balance articulated above and conclude the District abused its discretion by not proceeding in a manner required by law.

In *Eckerd*, the issue was whether the General Services Administration (GSA) was required to file an environmental impact statement (EIS, the EIR's counterpart under the federal National Environmental Policy Act, 42 U.S.C. § 4321 et seq.) on a proposed project under the federal Public Buildings Act. Under the Public Buildings Act, the GSA is required to obtain congressional approval before entering into construction contracts for new federal buildings. That act directs GSA to submit to the Public Works Committees of both houses of Congress a prospectus describing the proposed facility. If both Committees approve the project, GSA can proceed with construction without any further congressional authorization or appropriation. (564 F.2d at pp. 449-450.)

Although no particular site had been selected for the proposed building at issue in *Eckerd*—a new federal building in Jackson, Mississippi—the court held an EIS was required at the time GSA sought approval for the building from the two committees. This holding was based largely on the fact that "final approval" for the project rested in effect with the two committees. (564 F.2d at pp. 453-454.) As the court in *Eckerd* noted: "Once the Committees give their approval, the GSA *never* has to return to Congress for further authorization or appropriation. It is at a critical juncture like this,

when the Committees are weighing the final Congressional judgments about whether to proceed with these projects at all, that the 'environmental source material,' provided by an EIS, would appear to be particularly needed in the making of relevant decisions." (452 F.2d at p. 453, italics in original.)

By contrast, the Board/District here will have the benefit of an EIR *before* it gives its *final* approval to a new high school site. The *Eckerd* court's conclusion that the EIS could be prepared although a specific site for the building had not yet been chosen must account for the fact that if the EIS were delayed until after the two committees gave their approval, the final decision to build could be made without any meaningful environmental review. (452 F.2d at pp. 453-455.) That is not the case here.

In *Fullerton*, the State Board of Education approved a plan to carve a new high school district out of an old one. This plan was to be submitted to the voters. The *Fullerton* court concluded the State Board should have undertaken an initial threshold study under CEQA to determine whether an EIR was required before approving the plan and submitting it to the voters. (32 Cal.3d at pp. 794-798; see *Friends of "B" Street, supra,* 106 Cal.App.3d at pp. 999-1000.) This was because approval of the plan necessitated the building of a new high school and other actions potentially affecting the environment. (32 Cal.3d at pp. 797-798.)

The obvious distinction between *Fullerton* and this case is that *Fullerton* concerned "only an initial threshold study." (32 Cal.3d at p. 798, fn. 18.) In fact, the court in *Fullerton* emphasized this focus. (*Ibid.*) Here, by contrast, an EIR will be prepared. The initial threshold study in *Fullerton* may well have concluded that an EIR was not required or at least not required at that time. Moving past this obvious distinction—which we concede is somewhat superficial—does not help STOP get going either.

The court in *Fullerton* acknowledged that specific plans had not yet been formulated for construction of the new high school and that "delay of an environmental study until after the election might result in a more specific and useful study." (32 Cal.3d at p. 797.) The problem with such a delay, said the court, was that as a practical matter it precluded the alternative of continuing the status quo. Once the plan was approved, the new district would be created and the new high school would be built. (*Ibid.*) The situation presented here is not analogous. Under our decision, all reasonable alternatives must be thoroughly assessed. Thus, no alternative is precluded. Moreover, even STOP concedes that a new high school is needed. In this context, as we have seen, preparing an EIR after the preferred site has been chosen may "result in a more specific and useful study." (*Fullerton* v. *State*

*Board, supra,* 32 Cal.3d at p. 797.) Accordingly, the *Fullerton* decision, like the *Eckerd* decision, is inapposite.

Because we have determined that the EIR here must thoroughly assess all reasonable alternative sites, we believe it necessary to set forth in general the level of analysis of alternatives that must be included in the EIR. ■ CEQA requires that an EIR discuss alternatives to the proposed project. (§§ 21001, subd. (g); 21002.1, subd. (a); 21061; 21100, subd. (d).) Guidelines, section 15126, subdivision (d), mandates that an EIR must "[d]escribe a range of reasonable alternatives to the project, or to the location of the project, which could feasibly attain the basic objectives of the project and [must] evaluate the comparative merits of the alternatives." "In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* . . . available which would substantially lessen the significant environmental effects of such projects . . . .' [¶] The Legislature has defined 'feasible,' for purposes of CEQA review, as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' (Pub. Resources Code, § 21061.1; Guidelines, § 15364; [case citations].) . . . ■ Both the California and the federal courts have further declared that '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason.' " (*Goleta Valley, supra,* 52 Cal.3d 553, 565 italics in original.) "[T]he government's power of eminent domain and access to public lands suggest that alternative sites may be more feasible, more often, when the developer is a public rather than a private agency. [Citations.]" (*Id.* at p. 574.) Information must be provided sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. (*Laurel Heights, supra,* 47 Cal.3d at p. 406; see also Guidelines, § 15126, subd. (d)(5).) " 'The key issue is whether the selection and discussion of alternatives fosters informed decisionmaking and *informed public participation.*' " (*Laurel Heights, supra,* 47 Cal.3d at p. 404, quoting Guidelines, § 15126, subd. (d)(5), italics added in *Laurel Heights.*) Alternatives must be discussed in the EIR in sufficient detail to enable meaningful participation and criticism by the public. (*Id.* at p. 405.) If various alternatives were considered and found infeasible, those alternatives and the reasons they were rejected must be discussed in the EIR in sufficient detail to enable this public participation and criticism as well. (*Ibid.*) Informed public participation "is especially important when, as in this case, the agency approving the proposed project is also its proponent or closely related to its proponent." (*Id.* at p. 406.) However, the need for

thorough discussion and analysis is not to be construed unreasonably to serve as an easy vehicle for defeating projects. (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Sims, J., concurred.

A petition for a rehearing was denied November 21, 1991, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 15, 1992.