Filed 8/17/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLANTE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| MARTHA BRIDGES et al., <br>    Plaintiffs and Appellants, <br>      v. <br> MT. SAN JACINTO COMMUNITY COLLEGE DISTRICT, <br>    Defendant and Respondent; <br> RIVERSIDE COUNTY REGIONAL PARK & OPEN-SPACE DISTRICT, <br>    Real Party in Interest and Respondent. | E065213 <br><br> (Super.Ct.No. RIC1410388) <br><br> The County of Riverside <br><br> ORDER MODIFYING OPINION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT

The opinion filed in this matter on August 8, 2017 is hereby modified as follows:

1. On page 2: line 12, change "dismissed the action" to "denied appellants' CEQA petition"

2. On page 4: line 20, change "suit" to "petition"

3. On page 9: line 4, change "Dismissal of Appellants' Suit" to "Denial of Appellants' Petition"; lines 5 through 6, change "dismissed appellants' suit" to "denied appellants' petition"; line 12, change "dismiss the suit" to "deny the petition"

4. On page 26: line 4, change "dismiss" to "deny"; first sentence under heading II.B.2, change "dismissing" to "denying"

5. On page 28: line 6, change "dismissal" to "denial"

1

Except for this modification, the opinion remains unchanged.  This modification does not affect the judgment.

CERTIFIED FOR PUBLICATION

SLOUGH_____
                                                                          J.

We concur:


MILLER_____
            Acting P. J.


FIELDS_____
                        J.

Filed 8/8/17 (unmodified version)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| MARTHA BRIDGES et al., | |
| Plaintiffs and Appellants, | E065213 |
| v. | (Super.Ct.No. RIC1410388) |
| MT. SAN JACINTO COMMUNITY COLLEGE DISTRICT, | OPINION |
| Defendant and Respondent; | |
| RIVERSIDE COUNTY REGIONAL PARK & OPEN-SPACE DISTRICT, | |
| Real Party in Interest and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Craig Riemer, Judge.

Affirmed.

Law Offices of Robert A. Pool and Robert A. Pool for Plaintiffs and Appellants.

Atkinson, Andelson, Loya, Ruud & Romo, John W. Dietrich, David D. Boyer, and

Jennifer D. Cantrell for Defendant and Respondent.

1

Gregory P. Priamos, County Counsel, Karin Watts-Bazan, Tiffany N. North, and Melissa R. Cushman, Deputy County Counsel, for Real Party in Interest and Respondent.

This California Environmental Quality Act (CEQA)[1] case arises from a community college's decision to buy a plot of vacant land from a regional park district for potential future use as the site of a new campus. Plaintiffs and appellants Martha Bridges and John Burkett (appellants) are residents of Wildomar, the city where the land is located. They sued respondent Mt. San Jacinto Community College District (the community college, or the college) alleging it violated CEQA by failing to prepare an environmental impact report (EIR) before executing a purchase agreement for the property. Appellants also allege the community college violated CEQA by failing to adopt local CEQA implementing guidelines.

The trial court dismissed the action in its entirety, and we affirm. As we explain, appellants did not exhaust their administrative remedies before filing this suit and have not demonstrated they were excused from doing so. And, even if the exhaustion doctrine did not bar appellants' suit, we would affirm the court's ruling because both of their CEQA claims lack merit. As to their first cause of action, CEQA does not require the college to complete an EIR before signing a purchase agreement, especially under these circumstances, where the agreement itself requires the college to complete an EIR before the sale can be finalized. As to their second cause of action, the college is exempt from

---

[1] Public Resources Code section 21000 et seq. Any unlabeled statutory citations refer to the Public Resources Code.

2

formally adopting local implementing guidelines because it uses the guidelines of another California agency.  (§ 21082.)

# I

# FACTUAL BACKGROUND

A.      *The Wildomar Property and the Option Agreement*

The property at issue is a plot of about 80 acres of unimproved land in Wildomar, about a mile southwest of the Interstate 15 (the Wildomar property, or the property).[2] Since at least the early 2000's, the community college has wanted to build new campus facilities in southwest Riverside County to "serve the growing communities along the Interstate 15 corridor."  By the spring of 2003, the college had identified the Wildomar property as a potential site for new facilities and entered into a two-year option agreement with its owner, respondent and real party in interest Riverside County Regional Park & Open-Space District (the regional park district, or the district), setting the purchase price at $4.8 million.

By way of background, the Wildomar property was the subject of a lawsuit that made its way to our high court in *Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282 (*Ste. Marie*).  In 2003, a Wildomar resident filed an action to void the option agreement on the ground the property was dedicated park land and the regional park district had failed to follow the rules governing the sale of such land.  (*Id.* at p. 287.)  The trial court agreed and issued an order prohibiting the sale of the

_____

[2]  Wildomar is north of Temecula and south of Lake Elsinore.

property until the regional park district complied with those rules. (*Ibid.*) Our court affirmed, but the California Supreme Court reversed, holding the rules did not apply because the regional park district had not affirmatively dedicated the property as park land. (*Ibid.*) This holding, issued in 2009, allowed the sale process to reach the current impasse.

Documents in the administrative record suggest that while the *Ste. Marie* litigation was pending, the community college began the initial stages of environmental review under CEQA. In February 2004, the college completed an initial study and sent out scoping meeting notices to local residents and property owners. The college also issued notices of preparation of a draft EIR, one in February 2004 and another in May 2006. The May 2006 notice describes the "project" as the construction of a "Southwest Campus" consisting of "low-profile (one- and two-story structures) academic classroom and administration buildings; art and cultural program buildings; sports facilities, including fields; and staff, student, and visitor parking facilities." The campus would ideally serve about 15,000 part-time and 10,000 full-time students and 400 faculty and staff, would total about 488,000 square feet, and would require about 3,300 parking spaces.

The May 2006 notice is the last CEQA document in the administrative record. The college says it paused its CEQA review during the *Ste. Marie* litigation and has not yet completed an EIR. At the hearing on appellants' suit, the college told the trial court it

4

was in the process of preparing an EIR and would complete it before entering escrow on the property.

From 2006 to 2011, the parties amended the option agreement to keep it in force, but in the spring of 2011 the college let the agreement expire. Up to that point, the college had paid $350,000 to the regional park district under the option agreement.

B. *The Facilities Master Plan*

In 2010, the college hired a consultant to develop a facilities master plan, a document intended to "translate the strategic goals and objectives of the Education Master Plan" into a "physical" plan for facilities. The facilities master plan would contain design guidelines for four different areas of construction—the San Jacinto, Menifee, and San Gorgonio Pass campuses, plus a "future site plan."

The consultant provided an overview of the facilities master plan at the college's board of trustees meeting in October 2011 during the "information" segment of the meeting. Included in the administrative record, and therefore likely shown during the overview presentation, is a December 2010 PowerPoint by the consultant entitled, 2050 Facilities Master Plan: Wildomar Campus. The PowerPoint consists of 10 slides and provides a general overview of a possible new campus in Wildomar. It broadly outlines three stages of construction and contains some general information about enrollment projections, parking availability, and landscape design. It also identifies various goals and challenges associated with the future site of the Wildomar campus, including "[i]dentifying optimum sites" in proximity to "San Diego colleges." Unlike items

5

presented during the "consent" or "open agenda" segment of board meetings, items presented during the "information" segment do not call for any action or votes. The administrative record contains no indication the board of trustees has ever voted to approve the facilities master plan or the Wildomar Campus PowerPoint.

C.    *The Purchase Agreement*

By the spring of 2014, the parties were again in talks over the Wildomar property. At the college's board of trustees meeting on May 8, 2014, the board considered a motion to enter into an agreement to purchase the Wildomar property from the regional park district for $2.455 million.[3] The agenda for the May 8 meeting lists the motion to approve the purchase agreement as an open agenda item and invites public comment. A memo attached to the agenda provides background information on the purchase agreement, noting the college has a "goal of campus development which include[s] planning for the addition of community college facilities to serve the growing communities of southwest Riverside County."

According to the minutes for the May 8 meeting, there were no public comments on the motion to approve the purchase agreement and most of the trustees' discussion of the motion concerned the property's sale price and future use. One of the trustees expressed her desire the Wildomar property become "a third campus site." She said if the board authorized proposing a bond and the voters approved the bond, the proceeds "could

---

[3] The original price was $2.63 million but the district gave the college a $175,000 credit in consideration for the $350,000 the college had expended under the option agreement.

be used for that site *if the Board votes to do that*." (Italics added.) The college's president said the college "has looked at alternative sites over the years and hasn't identified a more favorable location that we can afford." The board ultimately approved the motion to authorize the purchase agreement.

On June 3, 2014, the regional park district passed a resolution stating its intent to sell the Wildomar property to the college. The resolution states the purchase agreement will require "certain contingencies must be satisfied before the sale of the [p]roperty can be authorized and before escrow can open in order to consummate this transaction." The resolution does not mention how the community college intends to use the property.

On June 12, 2014, the parties executed the purchase agreement. As relevant here, the agreement conditions the opening of escrow on both parties' CEQA compliance. Article 7.1(a) requires the college to take "all final actions necessary . . . to comply with CEQA to support the purchase of the [p]roperty." Article 7.1(c) requires the district to "complet[e] requisite activities to comply with CEQA" and resolve any legal challenges "based on CEQA." Article 7.1(d) states, "Until such time that the above contingencies have been satisfied, the [p]arties are not bound hereby unless and until compliance with CEQA is completed and there is no possibility of challenge pursuant to CEQA." The agreement also conditions the closing of escrow on CEQA compliance. Articles 7.3 and 7.4 require the college and the district, respectively, to ensure "[t]he disposition of the [p]roperty is in compliance with [CEQA]." The agreement makes no reference to any intended future use of the property.

7

D.    *The Measure AA Bond*

In August 2014, the college approved a resolution to place on the November ballot a $295 million bond measure called the "Mt. San Jacinto College Affordable Education and Job Training Measure." The text of the measure says bond proceeds will be used for two overarching types of improvements to the college: (1) facility and technology upgrades geared toward job training and veteran services, and (2) construction projects geared toward providing affordable education and more disability access. The measure lists numerous potential projects under each improvement type, as well as a vast number of "additional" projects, one of which is "a new campus along the I-15 corridor to serve additional students." The measure does not commit the college to any particular project and qualifies that "certain of the projects described above may be delayed or may not be completed" due to cost and funding issues.

In September 2014, the college released a list entitled, "Measure AA Potential Bond Projects," containing 31 projects and their estimated costs. A project described as "Construct and Equip a Permanent Southeast Corridor Center—Wildomar" is number 21 on this list, with an estimated cost of $47.4 million.

In one of its newsletters, the college promoted the bond measure as a means to upgrade and expand its facilities. The newsletter also says the college plans to build "permanent facilities" in Wildomar "[a]s funding becomes available," and notes the college "approved the purchase of 80 acres in Wildomar" which "has been identified in the future for STEM (science, technology, engineering, math) programs."

8

Appellants filed this action the day the voters approved the bond measure. Their suit seeks orders directing the community college to set aside the purchase agreement and to adopt local CEQA implementing guidelines.

E.     *Trial Court's Dismissal of Appellants' Suit*

After considering the trial briefs and oral argument, the trial court dismissed appellants' suit. The court found the first cause of action unnecessary because CEQA requires an EIR before the purchase is *final* (not before executing a purchase agreement) and the purchase agreement requires an EIR to initiate *escrow*. As to the second cause of action, the court ruled the college was exempt from adopting local implementing procedures because it "utilize[s]" the same guidelines that Riverside County and the California Community College Chancellor's Office have adopted. The regional park district argued the trial court should dismiss the suit, citing the appellants' failure to exhaust their administrative remedies by objecting to the purchase agreement before the college executed it. The court declined to address the exhaustion issue "[i]n light of [its] rulings on the merits."

**II**

**DISCUSSION**

A.     *Exhaustion of Administrative Remedies*

The regional park district renews its exhaustion argument on appeal, and appellants respond that they were excused from objecting to the purchase agreement

earlier because the college did not give notice of the May 8 meeting at which it approved the agreement. We agree with the district.

"'"'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action."'"' (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615.) The purpose of the exhaustion doctrine is to ensure public agencies are given the opportunity to decide matters within their expertise, respond to objections, and correct any errors before the courts intervene. (Kostka & Zischke, *Practice Under the California Environmental Quality Act* (Cont. Ed. Bar 2017), § 23.98 (Kostka & Zischke); *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1394 (*Mani Bros.*).) "Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.' [Citation.] It can serve as a preliminary administrative sifting process [citation], unearthing the relevant evidence and providing a record which the court may review." (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 291 (*Tomlinson*).)

CEQA's exhaustion provision requires a party to inform an agency of an alleged CEQA violation orally or in writing before filing a CEQA action in court. (§ 21177, subds. (a) & (b); see also *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 ["Petitioners, having failed to raise their CEQA claims at the administrative level, cannot air them for the first time in the courts"].) CEQA provides

10

an exception to the exhaustion requirement if "there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, *or if the public agency failed to give the notice required by law*."**4** (§ 21177, subd. (e), italics added.) Notice in this context can be constructive, it need not be actual. (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 895 [if the agency provides notice as required by law, the petitioner is on constructive notice and "cannot . . . complain of an alleged lack of [actual] notice"], disapproved on another ground by *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499; *California Aviation Council v. County of Amador* (1988) 200 Cal.App.3d 337, 344 (*California Aviation*) [the petitioners could not establish exhaustion exception where the county published hearing notice in the newspaper and there was "nothing in the record to suggest that [the petitioners] had previously requested notice but failed to receive it"].) As relevant here, the Brown Act requires the college to post meeting agendas at least 72 hours in advance in a publicly accessible location, which includes the college's website. (Gov. Code, § 54954.2, subd. (a).)

A CEQA plaintiff bears the burden of demonstrating exhaustion of administrative remedies. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 526.) We apply a

___

**4** Appellants argue they fall under two exhaustion exceptions—the statutory no-notice exception (§ 21177, subd. (e)) and the common law "public interest" exception. Because both exceptions require a failure by the agency to provide notice of the relevant hearing, there is no practical difference between the two. (Kostka & Zischke, *supra*, § 23.108 [the public interest exception "has been limited to situations in which the petitioner had no notice of the administrative proceedings" and the exception "adds nothing to the statutory exception" in § 21177, subd. (e)].)

11

de novo standard of review to the legal question of whether the doctrine of exhaustion of administrative remedies applies in a given case. (*Ibid.*)

Here, the record demonstrates the college considered and authorized the purchase agreement at the public meeting of its board of trustees on May 8, 2014. This was not a public hearing held under CEQA, but it was a regularly scheduled meeting of the college's board of trustees that was open to the public and as such triggers CEQA's exhaustion requirement. (*Mani Bros.*, *supra*, 153 Cal.App.4th at p. 1395 [although the agency's regularly scheduled, public meetings were not CEQA hearings, the meetings constituted "'an *other opportunity* for members of the public to raise . . . objections orally or in writing prior to the approval of the project'" under § 21177, subd. (e)].)

The administrative record contains an agenda for the May 8 meeting. This agenda lists the purchase agreement as an action item and informs the public it may comment on any agenda items during the segment of the meeting devoted to public comment. The purchase agreement memo attached to the agenda provides background on the college's negotiations with the district and states the college's goal of building a campus in southwest Riverside County. It is undisputed appellants did not offer any comments at this meeting, or submit an objection in any other form before the college approved the motion authorizing the purchase agreement. If appellants were concerned about the college's timing of EIR preparation, the May 8 meeting was the time for them to voice those concerns.

12

The exhaustion issue therefore boils down to whether the college properly posted the agenda under the Brown Act to give appellants constructive notice of the meeting at least 72 hours in advance. It is appellants' burden to demonstrate the no-notice exception applies to them and to that end they have provided nothing but their allegation the college did not properly notice the meeting. (*California Aviation*, *supra*, 200 Cal.App.3d at p. 344 ["plaintiffs [must] show that Board failed to give the notice required by law, or that they are members of the public addressing a public wrong and no notice of the hearing was given them in any form"].) In its appellate brief, the regional park district directs us to a page on the college's website that contains a posting of the May 8 meeting agenda dated May 2, 2014, more than three days before the meeting. (http://www.msjc.edu/BoardofTrustees/Documents/Forms/AllItems.aspx?RootFolder=%2FBoardofTrustees%2FDocuments%2FMeeting%5FAgendas%2F2014.) However, we cannot consider this evidence because no party moved to augment the record with it and it is not the type of agency action we may judicially notice. (See Evid. Code, § 452, subds. (b), (c).) Faced as we are with a silent record on this issue, Evidence Code section 664 directs us to "presume[] that official duty has been regularly performed." (See also *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 925 [presuming under Evid. Code § 664 agency "regularly performed" its duty to timely mail out notice of availability of a draft EIR because petitioner had presented no evidence to the contrary].) Thus, despite our inability to consider the posting date on the college's

13

website, we presume the college posted the agenda at least three days before the meeting because the record contains no evidence it *failed* to satisfy that deadline.

Appellants cannot show CEQA's exhaustion exception for lack of notice applies to them. They had an opportunity during the administrative proceedings to raise their objection to the purchase agreement and allow the college to respond before its actions were subjected to judicial review. They did not take advantage of that opportunity and are therefore barred from raising their objection in a CEQA suit.

B.    *The CEQA Action Lacks Merit*

Were we to conclude exhaustion did not bar appellants' suit, we would nevertheless affirm the trial court's ruling because the CEQA claims lack merit. (See *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 855 [analyzing merits of the petitioners' CEQA action despite concluding action was barred by exhaustion].)

1.    *The college has not yet triggered the duty to prepare an EIR*

CEQA and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq., the CEQA Guidelines) embody California's "strong public policy of protecting the environment." (*Tomlinson*, *supra*, 54 Cal.4th at p. 285.) "The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency

14

finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved." (*Id.* at pp. 285-286, quoting CEQA Guidelines, § 15002.)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process." (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.) "In the first step, the public agency must determine whether the proposed [action] is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency." (*Ibid.*, quoting § 21065.) "The second step of the process is required if the proposed activity is a 'project.'" (*Tomlinson*, at p. 286.) If so, the agency must then determine if the project is exempt from CEQA, and if not exempt, whether the project "may have a significant effect on the environment." (*Tomlinson*, at p. 286.) If the agency determines the project may have a significant effect on the environment, "the agency must proceed to the third step, which entails preparation of an [EIR] *before approval* of the project." (*Ibid.*, italics added.)

The college does not dispute that if it decides to develop the Wildomar property the development will be a project under CEQA. During the hearing on appellants' suit, the college told the trial court it was in the process of preparing an EIR for the project and will complete it before escrow opens on the Wildomar property. For appellants, it is not enough to complete an EIR before escrow opens; they argue the college was required to

15

issue an EIR before it signed the purchase agreement.  As we explain, appellants are incorrect.  Execution of the purchase agreement did not trigger the duty to prepare an EIR.  The college is well within CEQA compliance if it completes the EIR before it buys the property.  The purchase agreement obligates the college to do just that (by conditioning escrow on CEQA compliance) and the college has represented it is in the process of satisfying that obligation.

        a.      *The purchase agreement complies with CEQA's land acquisition agreement rule*

CEQA requires public agencies to ascertain "whether a project may have a significant environmental impact, and thus whether an EIR is required, *before it approves* that project."  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 394 (*Laurel Heights I*), italics added.)  "A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved.  If postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken."  (*Ibid.*)  "While [CEQA does] not specify criteria for determining when an agency 'approve[s]' a project, the law's implementing regulations, the CEQA Guidelines . . . do address the question."  (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 128 (*Save Tara*).)

When an agency purchases land "for a public project" that may have a significant impact on the environment, section 15004 of the CEQA Guidelines requires the agency to

16

prepare an EIR before it acquires the land. (CEQA Guidelines, § 15004, subd. (b)(1).) However, the guidelines allow the agency to "designate a preferred site for CEQA review and . . . enter into land acquisition agreements" if it "has conditioned [its] future use of the site on CEQA compliance," so long as it has not already approved "proceed[ing] with the use of [the] site for facilities which would require CEQA review." (CEQA Guidelines, § 15004, subd. (b)(2)(A).) Courts have recognized this provision as an exception to the rule an agency must prepare an EIR before acquiring the land *for a project*. (*Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 570 ["CEQA provides an exception to the prohibition on commitment to a project before environmental review for purposes of land acquisition"].)

In *Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772 (*Stand Tall*), a school district passed a resolution selecting a specific site for the construction of a new high school and a resolution directing its administration to make a formal purchase offer contingent on "completion of the EIR process." (*Id.* at p. 777.) The appellate court concluded the resolutions did not trigger the duty to prepare an EIR. The new school site selection was "expressly made contingent on CEQA compliance" and therefore did not "commit the District to a *definite course* of action" because the district would be required to "thoroughly assess all reasonable alternative sites in its EIR." (*Id.* at p. 781.)

In *Save Tara*, the California Supreme Court approved the CEQA Guidelines' "exception for land purchases" contingent on CEQA compliance as a "reasonable

17

interpretation of [the statute]." (*Save Tara*, *supra*, 45 Cal.4th at p. 134.) The court also approved of the *Stand Tall* court's application of the exception because the facts of that case showed the school district had not committed itself to a "definite course of action." (*Save Tara*, at pp. 132-133.) Our high court cautioned, however, that the acquisition exception was not a "broad rule" allowing EIR preparation to be postponed "in all circumstances by use of a CEQA compliance condition." (*Id*. at p. 133.) For example, an agency could not use a CEQA compliance clause to avoid the duty to prepare an EIR upon approval of a "*development decision* having potentially significant environmental effects." (*Save Tara*, at p. 134, italics added.) "Under *Save Tara*, the critical question is 'whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, *so as to effectively preclude any alternatives or mitigation measures* that CEQA would otherwise require to be considered, including the alternative of not going forward with the project.'" (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1170, italics added.)

Here, the college has entered into a land acquisition agreement that conditions the opening of escrow on CEQA compliance. What CEQA compliance entails in this context is completion of an EIR before the college buys the property. (CEQA Guidelines, § 15004, subd. (b)(1).) And, because nothing in the purchase agreement (or in any of the college's resolutions) commits the college to any type of construction plan, the college has in no way precluded its consideration of alternatives. (*Save Tara*, *supra*, 45 Cal.4th

18

at pp. 132-133.) We therefore conclude the purchase agreement did not trigger the duty to prepare an EIR.

Appellants argue this case is analogous to *Save Tara*, where the totality of the city's actions indicated it had committed itself to the project and, as a result, triggered the duty to prepare an EIR. We disagree. In *Save Tara*, the City of West Hollywood approved a "Conditional Agreement for Conveyance and Development of Property" between itself and a private developer who was proposing to redevelop a large mansion estate into a 35-unit housing development for low-income seniors. (*Save Tara*, *supra*, 45 Cal.4th at p. 122.) Among other things, the development agreement included a $1 million loan from the city to the developer to "facilitate development of the project and begin[ ] the process of working with [current] tenants to explore relocation options." (*Id.* at p. 124.) The development agreement conditioned the city's obligation to transfer the property to the developer "on all applicable requirements of CEQA having been satisfied." (*Id.* at p. 132.) The city and the developer argued the duty to prepare an EIR did not arise until there was an *unconditional* development agreement irrevocably vesting development rights. (*Id.* at p. 134.)

The California Supreme Court rejected this argument and concluded the totality of the city's actions demonstrated it had committed itself to the project. The city had conditionally agreed to sell the property to a private developer who had already drafted redevelopment plans; agreed to loan the developer funds for the redevelopment project; and had made numerous public statements and actions conveying its commitment to the

19

project. (*Save Tara*, *supra*, 45 Cal.4th at p. 140.) The court explained: "A public entity that, in theory, retains legal discretion to reject a proposed project may, by executing a *detailed and definite* agreement with the private developer and by *lending its political and financial assistance* to the project, have as a practical matter committed itself to the project. When an agency has not only expressed its inclination to favor a project, but has increased the political stakes by publicly defending it over objections, putting its official weight behind it, devoting substantial public resources to it, and *announcing a detailed agreement to go forward with the project*, the agency will not be easily deterred from taking whatever steps remain toward the project's final approval." (*Id*. at p. 135, some italics added.) The court cautioned, however, that not just any agency agreement concerning a project that has been "described in sufficient detail" will constitute commitment under CEQA. (*Save Tara*, at p. 136.) The test is whether the agency has in essence committed itself to a "definite course of action regarding the project." (*Id*. at p. 142.)

Nothing in the administrative record indicates the college has committed itself to a definite use of the Wildomar property. We can tell the college has put some thought and effort into the idea of building an additional campus in southwest Riverside County, however, unlike in *Save Tara*, no funds have been committed to the project and there is not even a developer (let alone "detailed" development plans) in the picture yet. (*Save Tara*, *supra*, 45 Cal.4th at p. 135.) In fact, the college has not even gone as far as the

20

school district in *Stand Tall* because it has not passed any resolutions selecting a site for its future campus.

Contrary to appellants' characterization, the consultant's 2010 "Wildomar Campus" PowerPoint presentation is a far cry from a development plan. And, while the bond measure has opened up options for the college, the college has not yet decided which of the many projects on its wish list it will fund with the bond proceeds. The board of trustees' discussion about the possibility of building a campus on the Wildomar property at the May 8 meeting is simply that, discussion. None of the statements at the meeting were binding on the college or commit it to any course of action regarding the Wildomar property. The same goes for the statement in the newsletter that the college hopes to build STEM program facilities in Wildomar.

The only physical descriptions of the future campus are contained in the May 2006 notice of preparation and the 2010 PowerPoint presentation and these are too vague and generalized to trigger meaningful environmental review. (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 394 [environmental review of a nebulous project will not produce information that is useful for deciding whether to approve the project].) In short, the record contains nothing to suggest the college has committed itself to a definite campus development. (*Save Tara*, *supra*, 45 Cal.4th at p. 142.)

b. *The purchase agreement is not a project*

Alternatively, appellants contend the purchase agreement itself is a project under CEQA that requires preparation of an EIR before approval. Appellants are wrong.

21

CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.) A "project" means "the whole of an action." (CEQA Guidelines, § 15378, subd. (a)(1).) The CEQA Guidelines provide the following list of examples of projects: "public works construction and related activities clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700." (CEQA Guidelines, § 15378, subd. (a)(1).); see also *Stand Tall*, *supra*, 235 Cal.App.3d at pp. 781-782 [concluding the school district's contingent campus site selection was not a project because it was nothing like the project examples in the CEQA Guidelines].)

*Friends of the Sierra Railroad v. Tuolumne Park & Recreation Dist.* (2007) 147 Cal.App.4th 643 (*Sierra Railroad*) is instructive. In that case, an organization filed a CEQA action to void a park district's transfer of a right-of-way to an Indian tribe, arguing the transfer was a "project" under CEQA and therefore the district was required to prepare an EIR before finalizing the transfer. (*Sierra Railroad*, at p. 647.) The appellate court concluded the transfer was not a project because "although some development of the property surrounding the historical resource was *reasonably foreseeable*, review of conceivable impacts on the historical resource itself would have been premature in the absence of any *concrete development proposals*." (*Ibid.*, italics added.)

22

The court acknowledged there were many indications in the administrative record that the tribe intended to do *something* with the acquired right-of-way. The tribe owned the land surrounding the right-of-way and was in the process of building on it a hotel, commercial development, and residential homes. (*Sierra Railroad*, *supra*, 147 Cal.App.4th at p. 649.) The tribe had even told the county planning commission in a letter that it "propose[d]" to use the right-of-way "for public hiking trails." (*Ibid*.) However, the court concluded the sheer "likelihood of *some* development" resulting from a land transfer "does not trigger CEQA review." (*Id.* at p. 657.) The court acknowledged "[t]here is no reason why CEQA review cannot be triggered by a transfer of ownership away from a public agency *if development plans are presented at the same time*." (*Id.* at p. 651.) The key consideration is that "CEQA review has to happen far enough down the road toward an environmental impact to allow meaningful consideration in the review process of alternatives that could mitigate the impact." (*Id.* at p. 657.) Because "no specific plans were on the table" when the park district transferred the right-of-way to the tribe, environmental review would not have been meaningful and, as a result, the transfer was not a project and did not trigger the duty to prepare an EIR. (*Ibid.*)

Such is the case here. Even though it is reasonably foreseeable the college may someday approve plans to build campus facilities on the Wildomar property, nothing in the purchase agreement commits the college to a definite course of development and there were no development plans in existence when it signed the agreement. As a result,

23

the purchase agreement is not a CEQA project and its execution does not trigger the duty to prepare an EIR.

### c. *Section 21080.09 is inapplicable*

Finally, appellants contend the college was required to prepare an EIR before executing the purchase agreement under section 21080.09 because it had selected a campus site and approved a long range development plan (LRDP). We disagree.

Section 21080.09 requires a college to prepare an EIR upon "[t]he selection of a location for a particular campus and the approval of a long range development plan." (§ 21080.09, subd. (b).) Appellants argue the purchase agreement itself constitutes a site selection and the 2010 PowerPoint constitutes an LRDP. This argument borders on the frivolous.

Campus site selection involves more than the execution of an agreement to purchase property. The site selection process for community college campuses is regulated under the Education Code, which imposes considerable due diligence before a college may acquire a "site on which it proposes to construct any school building." (Ed. Code, § 81033.) Section 81031 of the Education Code charges the California Community Colleges Board of Governors with the responsibility of "establish[ing] standards for community college sites." In that vein, the California Community Colleges Chancellor's Office's facilities planning manual establishes policies for new campus site

24

acquisition.**5**  The manual acknowledges that "the acquisition of a specific site may be desirable far in advance of the approval process for becoming a college [site]," and therefore allows college districts to purchase property before designating it as a campus site.  "A district may acquire a site *for future development* . . .  If a site is acquired *for use in the future as a college* . . . a district is expected to work with the Chancellor's Office to ensure that the location and development potential of the site is compatible with [the] state-wide development plan for higher education."  (Italics added.)  If, on the other hand, a college district acquires a site *for campus construction,* the "governing board of a community college district" must "have the site . . . investigated by competent personnel to ensure that the final site selection is determined by an evaluation of all factors affecting the public interest" rather than on "cost only," and must prepare a report including the site investigation results and a purchase recommendation.  (Ed. Code, § 81033.)  In other words, the college's desire to purchase the Wildomar property does not entail the selection of that property as a campus site.  The college may purchase the property "for future development," which seems to be precisely what it intends to do here.

As to the 2010 PowerPoint, CEQA defines an LRDP as a "physical development and land use plan to meet the academic and institutional objectives for a particular campus . . . of public higher education."  (§ 21080.09, subd. (a)(2).)  The ten-slide

---

**5**  We take judicial notice of the facilities planning manual, which is attached to the college's request for judicial notice in the trial court.  (Evid. Code, §§ 452, subds. (b), (c), 453.)

PowerPoint explores the *possible* features and challenges of building a new campus in southwest Riverside County. This brief, conceptual presentation is nothing like a development and land use plan.

We conclude the trial court was correct to dismiss the first cause of action.

2. *The college complies with section 21082 because it uses the CEQA Guidelines*

Appellants contend the trial court erred in dismissing their second cause of action, which alleges the community college violated CEQA by failing to adopt local implementing guidelines. We find no error.

CEQA requires public agencies to adopt local guidelines for implementing CEQA: "All public agencies shall adopt . . . objectives, criteria, and procedures for the evaluation of projects and the preparation of environmental impact reports and negative declarations [under CEQA]." (§ 21082.) An agency can comply with this requirement by adopting CEQA's implementing regulations, the CEQA Guidelines, "through incorporation by reference" and selection of "only those specific procedures . . . which are necessary to tailor the general provisions of the Guidelines to the specific operations of the agency." (CEQA Guidelines, § 15022, subd. (d).)

As relevant here, school districts are exempt from the requirement to adopt local guidelines if they "utilize" the guidelines of another public agency whose boundaries are coterminous with, or entirely encompass, the school district. (§ 21082; see also CEQA Guidelines, § 15022, subd. (b).) Section 21082 provides: "A school district, or any other district, whose boundaries are coterminous with a city, county, or city and county, may

26

*utilize* the objectives, criteria, and procedures of the city, county, or city and county, as may be applicable, in which case, the school district or other district need not *adopt* objectives, criteria, and procedures of its own." (Italics added.) In other words, this exemption provision allows a school district to piggyback on another agency's local guidelines, so long as that agency's geographic boundaries are the same as or fully encompass the school district's.

Here, the college has chosen to do just that. The college is located in Riverside County, which has adopted the CEQA Guidelines as its local implementing guidelines. (Riv. County Res. No. 2003-138, http://www.clerkoftheboard.co.riverside.ca.us/agendas/2003/2003_04_29/03.17.pdf [repealing former specialized local guidelines and adopting CEQA Guidelines as local guidelines].) Additionally, the Chancellor's Office, whose boundaries encompass the entire state, has adopted the CEQA Guidelines as its local implementing guidelines. (Ed. Code, §§ 70900-70901; Cal. Code Regs., tit. 5, § 57100.) According to the declaration of the college's vice president of business services, the college "uses: the CEQA Guidelines as its local implementing guidelines. By using the CEQA Guidelines, the college is exempt from the requirement of adopting local implementing guidelines.

Appellants argue the college does not qualify for the exemption unless it *formally adopts* a resolution or policy to use the CEQA Guidelines. We disagree. The language of section 21082 is clear. It exempts a school district from adopting local guidelines if it "utilize[s]" the guidelines another public agency has adopted. The lawmakers selected

27

the word *utilize* for the exemption provision when they used the word *adopt* elsewhere in the section. Had they intended school districts to formally adopt the other agency's guidelines, they would have chosen the word adopt, not utilize. And the word choice makes sense—an exemption from formal adoption would not be much of an exemption if it required *formal adoption*. We conclude the second cause of action lacks merit and affirm the trial court's dismissal.

## III

## DISPOSITION

We affirm the judgment and award costs to respondents.

CERTIFIED FOR PUBLICATION


SLOUGH_____
                                                                          J.

We concur:


MILLER_____
            Acting P. J.


FIELDS_____
            J.